In the Matter of the ADOPTION of Steven Sean PEARSON and Holly Deann Pearson,

Steven E. PEARSON, Appellant,

v.

Paul Douglas SIRON and Dorothy Dean Siron, Respondents.

No. WD 30826.

Missouri Court of Appeals, Western District.

Feb. 2, 1981.

James W. Gallaher, Jefferson City, for appellant. Barry, Neff, Gallaher & Venters, Jefferson City, of Counsel,

James T. Buckley, Sedalia; of counsel for respondents. Brown & Buckley, Sedalia, of counsel.

Before PRITCHARD, P. J., SWOFFORD, J. and HOUSER, Senior Judge.

HOUSER, Senior Judge.

This is a petition for adoption, contested by the natural father. The adoption was decreed, the court finding that the father for more than one year prior to the filing of the petition willfully neglected to provide his children with proper maintenance and support, and willfully abandoned them. Section 453.040(4), RSMo 1978. The father has appealed.

Appellant, Steven E. Pearson, and Dorothy Dean were married in 1969. Son Sean was born in June, 1971. Daughter Holly was born in August, 1973. The parents separated in October, 1973, and were divorced November 28, 1973. Custody of the children was awarded to their mother. Their father was ordered to pay $30.00 a week for their support. In April, 1974 Dorothy filed a complaint against Steven in the Magistrate Court of Lafayette County for nonsupport of the children. In May, 1974 the prosecuting attorney filed an information against Steven for nonsupport. On February 15, 1975 Dorothy and Paul Douglas Siron were married. They discussed the adoption of her children before their marriage and filed a joint petition for adoption in Lafayette County Circuit Court on November 20, 1975, as soon as the nine-month waiting period expired. In December, 1975 Steven filed a motion to modify the divorce decree to enforce rights of visitation, and a motion for temporary custody of the children. On April 6, 1976 the petition for adoption and the motions were consolidated and tried before the circuit judge, who took them under advisement. The judge retired September 1, 1978 without having ruled upon them. The proceedings in Lafayette County were subsequently dismissed. On October 30, 1978 Paul and Dorothy filed a new petition for adoption in the Circuit Court of Pettis County, they having moved to Sedalia in June, 1977. The proceedings on the second petition for adoption were tried in Pettis County Circuit Court in February, 1979.

Section 453.040(4), RSMo 1978 provides that

" * * * consent of the adoption of a child is not required of * * * a parent who has for a period of at least one year immediately prior to the filing of a petition for adoption, either willfully abandoned the child or wilfully neglected to provide him with proper care and maintenance * *."

█ "The result in this case is dictated by this court's limited scope of review. Rule 73.01 directs the court to review the case upon both the law and the evidence, giving due regard to the trial court to judge the credibility of the witnesses. The trial court's decree is to be sustained unless there is no substantial evidence to support it or it is against the weight of the evidence or it erroneously declares or applies the law, *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *In the Matter of D___ G___ K___, Jr. v. D___ G___ K___, Sr.*, 545 S.W.2d 81, 83 (Mo.App. 1976).

Under this binding rule we are obliged to affirm the judgment decreeing adoption. There is substantial evidence to support the judgment finding statutory neglect on the part of the natural father, the fitness of the adoptive parents and that the welfare of

the children will be promoted by the adoption. The court properly declared and applied the law. A contrary holding would be against the overwhelming weight of the evidence.

After the divorce Dorothy and the children lived at Higginsville. Right after the divorce Steven came to visit the children several times; thereafter "sometimes"; "not often"; "not regularly"; "off and on". During 1974 and in the early part of 1975, on several occasions, Steven took the children on weekends to his mother's house in Russellville. He also took them there for one week in the summer of 1974 and another full week "right after Christmas." During the first half of 1975 Steven came to visit the children at Dorothy's house "once a month", "off and on", and his visits were "very irregular". The last time he tried to arrange a visitation was on June 29, 1975. Just before Christmas in 1976 Steven, traveling with two friends on a trip to Kansas City, came to Dorothy's door unannounced. Dorothy did not allow him to visit the children, on the ground that she had had no prior notice of Steven's intention to visit, and that Holly, then two and one half years old, had not been prepared for the visit of her father, whom she did not know.

The following table summarizes testimony evidencing an intent or mental attitude on the part of Steven to forsake the status of a parent:

| | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|---|
| Birthday presents or cards? | | Yes | No | No | No | | |
| Christmas presents or cards? | Yes | Yes | No | No | No | No | |
| Any attempts to communicate with the children? | | No, except as above | | | No | No | No |
| Any phone calls to Dorothy? | | | | | No | No | No |
| Any letters or cards to Dorothy about the children? | | | | | No | No | |
| Any inquiry about the children through other persons? | | | | | No | No | |
| Any money paid to Dorothy for the support of the children? | No | No | A total of $270.00 | | No | No | No |

From November 28, 1973 to May, 1974 Steven was a college student at Joplin. From May, 1974 until November, 1974 he worked on his father's farm between Eldon and California. From November, 1974 to January, 1975 Steven worked at Eldon Optical Company. On January 3, 1975 he sustained an injury to his shoulder which kept him from doing any manual labor for four or five months. In July, 1975 he was employed as a guard at the state penitentiary in Jefferson City. This employment lasted about one year. After a two or three month break he worked for seven or eight months as a route salesman for Royal Crown Cola. Then he worked for the Jefferson City Housing Authority for eight months. From January, 1977 to August, 1978 he worked as an accountant for Mid-state Oil Company. After a one or two month period of studying to take an examination for a broker's license, in October, 1978, Steven took a position in Jefferson City as an insurance broker.

The Sirons moved to Sedalia in June 1977. The one-year period prior to the filing of the second petition for adoption commenced October 30, 1977. There was no contact between Steven and Dorothy, Paul and/or the children; no visitation or effort to see or visit the children; no expression of interest of any kind by Steven as the father of the children, from June 29, 1975 to the hearing in February, 1979, with the exception of the unannounced visit near Christmas, 1976.

Steven seeks to be excused from visitations during this period of three years and seven months on the ground that the Sirons refused to allow visitation; that they frustrated his attempts to meet his children. Dorothy testified that at no time did she ever refuse the father permission to see the children (with the exception of the Christmas, 1976 situation, and times when a proposed visit conflicted with plans and arrangements already made). She testified that she did not refuse him, but she conceded that when he called she would ask him about child support, and used his failure to pay child support as "a threat", saying "You can't see them if you don't pay". She emphasized, however, that *if he came to the house he saw them*. While the Sirons did nothing to encourage communication between the children and their natural father, and did not welcome his visits, there is testimony to support a finding that the Sirons did not engage in a course of conduct to deliberately deprive Steven of visitation rights or discourage such rights, or to disparage or denigrate the natural father. On the whole record we find that while the relationship between Steven and the Sirons was not cordial, neither was it hostile or prohibitory, and that if Steven had made reasonable efforts to see the children, he could have visited and communicated with them. The bald fact is that Steven gave the children some attention for the first year or two after the divorce, but thereafter his interest in them waned, and for three years or more, including the year prior to the filing of the adoption petition on October 30, 1978, he ignored them. There is substantial evidence from which the conclusion is inevitable that Steven's neglect of the children was intentional, deliberate and without justification, evincing a settled purpose to forego his parental duties over the period October 30, 1977 to October 30, 1978.

■ At no time during Steven's testimony did he express any affection or love for the children, or indicate a desire on his part to assume any of the burdens or responsibilities of nurturing and caring for the children. His only interest, according to this record, is in having an opportunity to see them occasionally. Steven seems to be perfectly willing to allow the mother and her present husband to buy all the food and clothing for the two children, provide shelter, pay all the bills and expenses of raising them, surround them with love and affection, and be responsible for their moral and spiritual welfare, while he contributes nothing materially and, so far as this record shows, nothing otherwise. A father "should not be able to treat a child as a plaything to pick up for sporadic enjoyment at his whim, while at the same time disclaiming the burdens, sacrifices, and ofttimes pains of nurturing and caring for the child." *In re Adoption of S*, 581 S.W.2d 113, 116 (Mo.App.1979).

The only money Steven has sent Dorothy since the divorce seven years ago is the sum of $270.00, which averages approximately ten cents a day for the support of two children. This money was sent in installments over a period of six or seven months, after the first petition for adoption was filed, and only after Steven's lawyer advised him to send it. Steven freely acknowledges an obligation to support his children, but argues that he was advised by his lawyer not to send any money to his children pending judgment in the Lafayette County Circuit Court, while the case was under advisement, "because there was court action still being taken on this"; that thereafter he offered Dorothy money but she told him not to give her money and that she failed to cash three or four money orders. Dorothy denied she had ever told Steven she would not accept his child support money. She testified she sent the three or four money orders to her lawyer because he had advised her to mail "any correspondence or anything (we) got" to the lawyer.

On financial ability to pay child support: At Eldon Optical Steven made $2.50 an hour. As a penitentiary guard he earned take-home pay of from $402.00 to $420.00 per month. As Royal Cola route man he earned $75.00 per week. His salary at the housing authority was $695.00 per month. As an accountant he earned $750.00 per month. In his latest employment as insur-

ance broker he was earning $500.00 per month. He is a single man with no obligation to support anyone but himself and his children. At one place in his testimony he admitted he had "maybe some" money to send the children, and later testified he "had money and funds available to provide for their care and support." During the first ten months of the critical year immediately preceding October 30, 1978, Steven was working for the housing authority at a salary of $695.00 per month.

■ Appellant's first point is that the court erred in finding that the statutory period for abandonment and neglect was the year preceding the filing of the *second* petition for adoption; that upon filing the first petition for adoption respondents thereby established the year preceding November 30, 1975 as the controlling period for determining the issues of abandonment and neglect; that appellant's actions during the time the judge had the case under advisement could not have been "willful in regard to the issue of abandonment and neglect."

■ Section 453.040(4) RSMo 1978 plainly specifies the period of one year immediately prior to the filing of a petition for adoption. This refers without question to the petition for adoption before the court for consideration, and not some previous petition for adoption which has been dismissed. The year preceding November 20, 1975 was the controlling period in the first adoption case, but that case was dismissed. When it was dismissed that time period lost its significance as the controlling period, and what happened or did not happen during that year became simply part of the past, all of which is for consideration for what it is worth in determining the issue of purpose and intent. Neglect is a matter of intent and " * * * evidence of a parent's conduct either before or after the statutory period, may be considered to determine the purpose and intent of the parent." *In re Adoption of K.,* 417 S.W.2d 702, 709 (Mo.App.1967). When the second petition was filed on October 30, 1978 the year immediately preceding that date became the controlling period but

again, as stated in *In re Adoption of S,* 581 S.W.2d 113, *supra,* "in determining whether there has been abandonment or neglect, conduct of the parent both before and after the one year statutory period must be considered." Appellant's efforts to confine our review to the first time period is rejected.

■ Appellant's second point is that the court erred in finding willful failure to support the children because in the year preceding November 20, 1975 appellant did not have the means to support his children, and therefore his failure to contribute to their support was not willful. As we have indicated, we are not confined to the first period, but even during a considerable portion of that period appellant was earning over $400.00 a month as a penitentiary guard. Steven admitted he had money over and above his regular living expenses, but he testified he devoted the surplus to the payment of his lawyer and to payment of overdue bills. Looking at the entire period from date of divorce to date of the hearing of this petition, we find ample evidence of ability to pay child support. Certainly he had the ability to do so during the period of October 28, 1977 to October 28, 1978. Steven's failure and neglect to provide his children with support money during the critical period, in view of his recognition of the obligation to provide proper support and maintenance, and his financial ability to pay the modest amount ordered by the divorce decree, constitutes a further demonstration of willful neglect within the meaning of the statute. Steven's claim that he had insufficient funds, contradicted by his own testimony, stands for disapproval. His second reason for failing to provide child support, namely, that his lawyer told him not to make any payment pending disposition of the case in Lafayette County, is unsound. The pendency of the action, and the act of the judge in taking the matter under advisement, did not suspend the order of the divorce court directing payment of $30.00 per week for child support. The duty to support the children was a continuing duty. *D. A. Z. and R. N. Z. v. M. E. T., Jr.,* 575 S.W.2d 243 (Mo.App.1978). Legal

advice not to make court-ordered payments for the reason given was bad advice, and affords no protection to Steven.

The considerations pointing to the severance of the paternal ties in this case are stronger than those determined to be compelling in *Lambertus v. Santino*, 608 S.W.2d 502, (Mo.App.1980), decided by this court on November 3, 1980. The father in that case did make substantial payments of child support for a period of years. Steven paid ten cents per day. Although Steven was separated from his children by a mere 65 miles, he made no effort during the critical year to communicate with them. Steven has less excuse for not communicating with Sean and Holly during the year in question than Mr. Santino, who lived across the continent from his child. As this court said in *Lambertus*, 608 S.W.2d l.c. 506:

> "More to the point, more important than sending money, is the matter of communication—communication of love and affection by a parent to a child; the parent's expression of interest in the child and his world; the communicated desire to be in the child's company whenever possible; the development of a commonality of interest and an empathy with him."

Appellant's third point is that the court erred in finding that appellant willfully abandoned his children. Having determined that appellant willfully neglected to provide the children with proper care and maintenance, we need not explore the abandonment question. The statute is in the alternative and not in the conjunctive, and the finding of neglect is sufficient to dispense with the necessity of Steven's consent to the adoption, without regard to the question of abandonment.

There is ample evidence that petitioners are properly raising the children, and providing them with the necessities and comforts of a good home; that they are financially, morally and otherwise fully competent and capable of rearing these children in a positive and constructive manner; that they are being given love and affection and are happy and prospering in the home of respondents.

The finding of the circuit court is supported by substantial evidence, and is not against the weight of the evidence, and therefore the judgment is affirmed.