In the Matter of T.D.T. and A.F.T., Plaintiffs-Respondents,

v.

J.L.S., Sr., Defendant-Appellant.

No. WD 34428.

Missouri Court of Appeals, Western District.

July 17, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1984.

Application to Transfer Denied Oct. 9, 1984.

David C. Stover, Lee's Summit, Denis C. Englisby, Chesterfield, Va., for defendant-appellant.

Gary G. Sprick, Fayette, for plaintiffs-respondents.

Before SOMERVILLE, P.J., and CLARK and BERREY, JJ.

BERREY, Judge.

J.L.S., Sr., appeals from a decree, entered by the Circuit Court of Howard County, Missouri, granting the adoption of his natural son J., Jr. and his putative son D. The petitioners are T.D.T., the natural mother of both children, and her current husband T.T. The decree of adoption includes two findings of fact which appellant contends are not supported by the evidence: appellant willfully abandoned and willfully neglected J., Jr., and appellant is not the natural father of D. Pursuant to § 453.040(4),[1] these findings of fact obviated the necessity of obtaining appellant's written consent for the adoption of the children. Section 453.030(3).

Appellant and T.D.T. first met in November of 1966, while they both worked at a truck-stop cafe in Frederick, Maryland. Both were married to other spouses, though separated at the time. In 1967 they began a cohabitation together that would last for approximately thirteen (13) years. During this entire period they lived togeth-

---

1. All sectional references are to Revised Statutes of Missouri, 1978 unless otherwise specified.

er without the benefit of marriage. Indeed, appellant did not receive a divorce from his first wife until sometime in 1981. The record is silent regarding the date of T.D.T.'s divorce from her first husband. The couple resided in Maryland until March, 1969, at which time they moved to Michigan. In May, 1976, they moved to Virginia where they resided until their final separation in 1980.

T.D.T. bore two sons during her union with appellant. J., Jr. was born December 11, 1968, and there is no question that appellant is his father. D. was born July 19, 1974. T.D.T. testified that D. had been conceived sometime during the fall of 1973 when she and appellant were separated.

T.D.T. alleges that D.'s father is not appellant, but R.M. with whom she had sexual relations in 1973 while in Michigan. Additionally, there is undisputed testimony that in connection with a custody proceeding in Virginia during the year 1980, T.D.T. requested a blood test to determine paternity, but appellant refused.

Appellant alleges he and T.D.T. had sexual relations in November, 1973, at which time D. may have been conceived. At trial he conceded that he underwent a vasectomy in 1972.

The relationship between T.D.T. and appellant, according to the former's testimony, was a stormy one. In addition to the separation during which D. may have been conceived, there were several others. T.D.T.'s reasons for these separations were that "he [appellant] drank a lot, he was violent, he beat me." After D.'s birth appellant "especially when he was drinking, would want to know who the father was. He made threats that if he found out who it was he would kill him." T.D.T. also testified that after divulging the identity of D.'s father, appellant pointed an unloaded rifle at her and pulled the trigger three times. Immediately after this incident T.D.T. fled from the house and went to the home of her next-door neighbor and future husband T.T. T.D.T. did not return to her home, but subsequently moved into her brother's home.

T.D.T. and her children resided with her brother until the latter part of August, 1980. At that time the three of them moved to Missouri with T.T., who was also married, but separated from his wife. T.T. was subsequently divorced in February, 1981, and he and T.D.T. were married shortly thereafter.

Upon discovering that T.D.T. and the children had left the state of Virginia in August, 1980, appellant traveled to T.D.T.'s parent's home in Michigan. Unable to locate T.D.T. and the children there, appellant telephoned T.T.'s parents in Louisiana, Missouri, and they advised him that they had not heard from T.T. or T.D.T.

On September 2, 1980, appellant filed a petition in the Juvenile and Domestic Relations District Court of the City of Hopewell, Virginia, seeking custody of both J., Jr. and D. Several days later appellant located T.D.T., T.T., and the children in Bowling Green, Missouri. Appellant and his nephew drove from Virginia to Missouri where they found the children in a Bowling Green school. Appellant testified that he was prevented by the principal and two teachers from seeing J., Jr. but he was able to see D. and subsequently took him back to Virginia on or about September 15, 1980.

On February 23, 1981, the Domestic Relations District Court of the City of Hopewell, Virginia, entered an Order awarding joint custody of the children to appellant and T.D.T. The Order was based upon a mutual agreement reached by appellant and T.D.T. regarding custody, support, and visitation rights. The Order provided that appellant "shall have actual physical custody of the two infant children commencing July 1, 1981, and terminating one week prior to the commencement of the regular school term." The Order also provided that appellant pay to T.D.T. child support in the sum of $40 per week. Appellant failed to register the Virginia Order per § 452.510.

In early September, 1981, T.D.T. traveled to Virginia, located D., and returned to Missouri with him. Subsequently, on September 25, 1981, T.D.T. and T.T. filed their joint petition for adoption.

### I

In deciding this appeal this court reviews both the law and the evidence, and defers to the trial court's opportunity to judge the credibility of witnesses and choose between conflicting testimony. *Matter of Adoption of G,* 618 S.W.2d 462, 464 (Mo.App.1981); Rule 73.01(3)(b). The decree of adoption is to be sustained unless there is no substantial evidence supporting it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Matter of Adoption of Pearson,* 612 S.W.2d 30, 31 (Mo.App.1981), *citing Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

Additionally, while reference to other willful abandonment and willful neglect cases provide some guidance in reaching a decision, the very nature of these proceedings is such that each case must ultimately turn on its own unique set of facts. *S.C.H. v. C.W.H.,* 587 S.W.2d 945, 947 (Mo.App. 1979).

Bearing in mind the above-mentioned considerations, appellant's second assignment of error will be considered first.

Reviewing the evidence which was before the circuit court it is clear that the finding of fact that appellant is not the natural father of D. is supported by substantial evidence. Appellant and T.D.T. were separated from the latter part of September, 1973, until late November or early December, 1973. D. was born July 19, 1974. The circuit court took judicial notice of a two-hundred eighty (280) day period of gestation. *S.J.B. v. S.F.S.,* 504 S.W.2d 233, 235–36 (Mo.App.1973). Applying this judicially noticed fact, the date of D.'s conception is October 12, 1973.

Moreover, undisputed testimony established that appellant underwent a vasectomy in 1972. Appellant attempted to

soften the impact of this fact by testifying that he never returned to a physician to ascertain if the vasectomy had been successful. Appellant refused to submit to a blood analysis for determining paternity. As an unmarried, putative father appellant must prove paternity by a preponderance of the evidence. *Cf. Stegemann v. Fauk,* 571 S.W.2d 697, 701 (Mo.App.1978) (prosecutrix in paternity suit). Appellant failed to carry his burden. Appellant, not being the natural father of D., has no actual and justiciable interest susceptible of protection in this proceeding. *In Interest of D.M.H.,* 516 S.W.2d 785, 787 (Mo.App.1974). The trial court's finding of fact and conclusion of law that appellant is not D.'s natural father is supported by substantial evidence.

### II

The consent of a natural parent is required for the adoption of children under twenty-one (21) years of age, § 453.030(3), unless one of several enumerated exceptions under § 453.040 applies. The exception in the instant case, § 453.040(4), is where a parent "for a period of at least one (1) year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance." The statute is written in the alternative and a finding of willful abandonment *or* willful neglect satisfies the requirement.

Waiver of proper consent under § 453.040 is jurisdictional. *Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 357 (Mo. banc 1978). Only after determining there has been a willful abandonment or willful neglect will the issue of the child's best interest be reached. *In Re Adoption of W.B.L.,* 647 S.W.2d 531, 533–34 (Mo. banc 1983), *citing Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 357 (Mo. banc 1978).

Willful neglect is neglect that is intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego parental duties for the period of time prescribed by statute. *Lambertus v.*

*Santino,* 608 S.W.2d 502, 505 (Mo.App. 1980). "The willfulness of 'neglect' is more of a negative proposition, simply the failure to perform the duty with which the parent is charged by law and by conscience." *In Re Adoption of Mike and Russ,* 553 S.W.2d 706, 708 (Mo.App.1977). However, willful neglect is a matter of intent and evidence of appellant's conduct, either before or after the statutory period, may be considered to determine his intent. *Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 358 (Mo. banc 1978).

Appellant does not dispute the fact that he furnished no child support for J., Jr. during the one year prior to the filing of the petition for adoption. Appellant had the financial ability to make these support payments. Appellant's reason for not making payments is gleaned from the following trial testimony:

Q. Let's talk about J. J. was back in Missouri, he was going to school, why didn't you pay the support the agreement said you should pay for J.?

A. I did not have to pay any support, when I have one child and she has one child there is no support. The only time I pay support is when she has both children.

Q. Isn't it true she had custody of J and you should have paid for his support?

A. No, the agreement is I only pay support when she has both children.

Q. It is not what it says. Is that the way you understood it?

A. That was the agreement, the way I understood it, yes. She did question me about this when I came to Missouri to pick up the automobile and I told her to talk to her lawyer.

\* \* \* \* \* \*

Q. All the period of time that you were with her, and after, have you been able to be employed and earn money?

A. Yes.

Q. You are physically able-bodied today?

A. Yes.

Q. Yet, it is true that you have never, from the time she left Virginia and took the children, you have never paid any child support, is that true?

A. Not since she left Virginia and came to Missouri.

Q. You have never paid any support?

A. No.

\* \* \* \* \* \*

Q. Tell me why you haven't paid any support.

A. Because I couldn't talk to my children or see my children.

Appellant's contention that he need not provide child support unless T.D.T. has custody of both children is not a "just cause or excuse" for not fulfilling this parental responsibility. Even if appellant, through erroneous legal advice, understood this to be the agreement, it does not afford him any protection. *Adoption of Pearson, supra* at 34–35. The duty to support was a continuing duty. *D.A.Z. and R.M.Z. v. M.E.T., Jr.,* 575 S.W.2d 243 (Mo.App.1978).

Appellant's second contention, that T.D.T. prevented him from seeing or speaking with J., Jr. during the statutory period, is contradicted by T.D.T.'s testimony. Hence, given this case's disposition at the trial stage such a conflict is resolved in favor of T.D.T. Appellant does not have a reasonable excuse for shirking his parental responsibility.

To constitute willful neglect, however, there must be more than evidence of a parent's failure to support. "It must be intentional. There ... [must be] evidence in the record of ... [appellant's] ability to contribute to the support of the children and this alone [sic] with the other evidence before the court ... [will be] sufficient to show the failure was intentional and without excuse." *S.C.H. v. C.W.H.,* 587 S.W.2d 945, 947 (Mo.App.1979).

During the alleged year of willful neglect by appellant, September 30, 1980,

through September 29, 1981, J., Jr. resided with his mother and T.T. in Missouri. Appellant sent J., Jr. Christmas, birthday and Easter cards in addition to Christmas and birthday gifts in 1980. J., Jr. made collect telephone calls to appellant. Appellant also telephoned J., Jr.

Conversely, testimonial evidence supporting the contention appellant forwent his parental responsibilities was offered by T.D.T.:

Q. Did he ever visit during that period of time?

A. No.

Q. Did you take steps, or see to it, or try to keep him from visiting?

A. No.

Q. Did he ever ask to visit?

A. No. He told Jimmie several times he was coming down but he didn't.

Q. Do you know whether he was ever in this area?

A. Yes, he was.

Q. When was that?

A. In April of '81.

Q. Where was he?

A. He was in Bowling Green.

    *     *     *     *     *     *

Q. Did he come over to see Jimmie at this time?

A. No, he didn't.

Q. Did you tell him Jimmie was available?

A. He didn't ask. He didn't ask about the child at all.

Q. What was the purpose of his call?

A. Business, there was a car involved and everything, he had come down and picked it up but neglected to have the title signed before he came after it, the title was still in my name.

Q. You say he didn't make any reference to Jimmie?

A. No.

Appellant's failure to see, or even inquire about, J., Jr. during his visit to Missouri shows an unconcern and total disregard for J., Jr. which cannot be offset by a few gifts, greeting cards and several telephone calls.

■ The aggregate evidence of appellant's failure to pay child support, though he had the ability to do so, failure to visit during the one year statutory period, and failure to even inquire about J., Jr. during the trip to Missouri supports the trial court's conclusion of law that appellant willfully neglected J., Jr. Hence, the issue of willful abandonment need not be addressed since § 453.040(4) is written in the alternative; the finding of willful neglect satisfies the statutory requirement.

■ The evidence also indicates that affirmance of the decree of adoption is in J., Jr.'s best interest. Both J., Jr. and D. stated that they wanted to be adopted and remain in the home of T.T. and T.D.T. Both children are enrolled in a private school and doing well academically. T.T., T.D.T., and the children reside in a four-bedroom home on the edge of a farm that T.T. rents. They attend church as a family unit. Additionally, T.T. is gainfully employed, at a wage of approximately $425 per week, and able to fulfill the children's financial needs.

Moreover, both J., Jr. and D. stated that they did not want to visit or see appellant. Both children expressed a preference for T.T. over appellant. In the face of all the evidence in the record, what benefit would the children receive by a denial of the adoptions? This court does not perceive any.

The decree of adoption is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. This court is bound to affirm the decree. *Adoption of Pearson, supra* at 31.

Judgment affirmed.

All concur.