Drake Joseph KAMBITCH,
Petitioner-Appellant,

v.

Terri Lynn EDERLE (Now Fredrich) and
Dana Lynn Ederle, a minor,
Respondents,

Anita Sawhill, Intervenor-Appellant,

and

In the Interest of Dana Lynn
EDERLE, a minor child,

Terri Lynn FREDRICH and Terrance
Joseph Fredrich, Petitioners,

v.

Drake Joseph KAMBITCH,
Natural Father.

No. 44447.

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 9, 1982.

---

James R. McHaney, Cape Girardeau, Kenneth S. Lay, Clayton, for petitioner-appellant.

William L. Syler, Jr., Paul H. Berens, Cape Girardeau, for respondents.

PUDLOWSKI, Judge.

This appeal arises from an unwed father (the natural father) who filed a suit seeking visitation rights with his child. A separate adoption petition had been filed by the natural mother and her husband. The natural father was permitted to intervene in the adoption action and the cases were consolidated for trial purposes. At the trial, the mother of the natural father (the "paternal grandmother") filed a motion to intervene, also seeking visitation rights with the child. This motion was denied. The parties stipulated to the parentage of the child. The trial court approved the petition for adoption after finding that the natural father had willfully neglected the child within the meaning of § 453.040(4), RSMo (1980). The natural father's request for visitation rights was denied. We affirm.

The child who is the focus of this action was born in November, 1975. The natural father and mother were not married at the time and were never subsequently married to each other. At the time of the birth they had broken off their relationship and had not seen one another for several months. The natural father was not told of the pregnancy but received a letter from the mother a few days after the child's birth informing him of his paternity. He went on a hunting trip and visited the mother and child on his return. All doubt of his paternity vanished when he observed that the child did not have fingernails. He knew that this was a symptom of "nail-patella syndrome," a hereditary condition from which he also suffered.

The hospital bill was paid by the mother's parents. The natural father made no contribution for the expenses connected with the birth, or for subsequent medical expenses connected with the nail-patella syndrome.

The paternal grandmother visited the mother and child shortly after the birth. She continued to visit them regularly. She travelled from St. Louis to Cape Girardeau about twice a month. The natural father also visited on some of these occasions often at his mother's suggestion. He rarely visit-

ed the child on his own. For a period of time during 1976, the mother was dating another man and refused to allow either the natural father or paternal grandmother to visit the child; however, the visits resumed after a short time.

In August, 1977, the natural father married.[1] Shortly thereafter the mother moved from Cape Girardeau to St. Louis in order to take a job in a business run by the paternal grandmother. She and her child lived with the paternal grandmother for about three months and then moved to her own apartment while continuing to work with the paternal grandmother for approximately a year and a half. The paternal grandparents frequently took care of the child. They purchased gifts and assisted her mother financially. The testimony of all parties agreed that a close and affectionate relationship existed between the paternal grandmother, mother, and child at this time. The relationship of the father with the child was more distant. Although the father testified that he loved this child, he provided only sporadic support.[2] He failed to exhibit any affection toward the child on his infrequent visits and did not show any concern for the child's personal development. When he was working out of town or when the child was living in different cities, he did not communicate with either the mother or child.

While living in St. Louis the child's mother began dating a married man. Both the paternal grandmother and the natural father disapproved of this relationship and some dissention between the parties ensued. The mother returned to Cape Girardeau with her child in February, 1979, and thereafter refused to permit either the natural father or paternal grandmother to visit the child.

After returning to Cape Girardeau the mother married the man who is now seeking to be the adoptive father. The child has lived with them since their marriage in June, 1980.

In the summer of 1979, the natural father began sending monthly checks for $50 for the child. These amounts were refused and the mother requested that no more be sent. At the time that these payments were first tendered the natural father was making approximately $300 to $340 per week in gross pay. This was the first time he had attempted to make regular support payments even though he had been continuously employed since the child's birth. During this period the natural father sent a few gifts to the child (which were also refused). Subsequently these causes of action were commenced.

The trial court found that the natural father had continuously and willfully neglected the child within the meaning of § 453.040(4) RSMo (1980). In making this finding, the court pointed out: (1) that the natural father was financially able to provide adequate support but that his contributions had been both erratic and inadequate; (2) that he failed to visit the child regularly despite living within 125 miles of the child's home; (3) that he did not show affection for the child; and (4) that he failed to provide the child with any parental guidance or psychological support. Having made this finding of neglect the trial court approved the adoption without the natural father's consent pursuant to § 453.030 and § 453.040(4) RSMo (1980). In denying visitation rights to the natural father, the court cited the same reasons that supported its finding of willful neglect.

On appeal, the natural father does not challenge the fitness of the adoptive father, or claim that the adoption would be contrary to the best interests of the child (see § 453.030.1). He asserts only that his consent should have been required because the trial court's finding of neglect was against the weight of the evidence and not supported by sufficient evidence. Further, he contends that even if the adoption does proceed without his consent, he is entitled

---

1. This marriage ended in separation after 4 months and dissolution a year later.

2. The trial court found that his expenditures on behalf of the mother and child totaled less than $750 over a period of 44 months.

to reasonable visitation rights in the absence of a showing that visitation would be detrimental to his child.

The paternal grandmother appeals contending that the trial court erred in denying her motion to intervene because as a grandparent, she had a statutory and common-law right to visit her grandchild, which was independent of the rights of her son and could not be adequately protected by him since their interests did not necessarily coincide.

We first consider the natural father's claim that the trial court's finding of neglect was not supported by the evidence and was against the weight of the evidence. The natural father directs our attention to his own favorable testimony regarding the frequency of his visits and extent of his support for the child. He also argues that his tender of support payments during the statutory period, and the fact that he has filed suit to gain visitation rights, shows that he has "repented" of his earlier conduct and now intends to take some responsibility for his child. Similar actions have been viewed in the courts as "strong and persuasive indicia" that no willful neglect has taken place. *S.C.H. v. C.W.H.,* 587 S.W.2d 945, 948 (Mo.App.1979); *Tomlinson v. O'Briant,* 634 S.W.2d 546 (Mo.App.1982); *Wellington v. Grieshaber,* 631 S.W.2d 883 (Mo.App.1982).

Ordinarily, adoption requires the consent of both natural parents, § 453.030.3, RSMo (1980); *State ex rel. J.D.S. v. Edwards,* 574 S.W.2d 405 (Mo. banc 1978), but that requirement may be dispensed with if willful neglect is shown. Section 453.040, RSMo (1980) provides that:

> The consent of [sic] the adoption of a child is not required of
>
> \*      \*      \*      \*      \*      \*
>
> (4) A parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or *willfully neglected to provide him with proper care and maintenance.* (emphasis ours).

A showing of neglect is jurisdictional when an adoption is approved without the consent of a parent. *R.A.B. v. R.A.B.,* 562 S.W.2d 356, 357–358 (Mo. banc 1978). And because abandonment and neglect are matters of intent, "evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent." *Matter of Adoption of Baby Girl Doe,* 621 S.W.2d 87, 89 (Mo.App.1981).

In this case, the trial court properly considered the natural father's actions prior to the statutory period in determining his intent during the statutory period. It concluded that he had never shown any serious interest in the child. The trial court clearly did not believe the natural father's own testimony about the extent of his past visitation and support. Rule 73.01(a)(2) and (c)(2). It was similarly entitled to disbelieve his testimony that he would change his conduct in the future. *Id.*

The trial court made explicit findings supporting its conclusion. *S.C.H. v. C.W.H., supra,* 587 S.W.2d at 948. It observed that the natural father's tendered support contributions were inadequate, viewed in the light of the child's needs and his ability to pay. More importantly, the trial court found that the natural father felt no interest in the development of his child as a person; he did not exhibit "a commonality of interest and an empathy" with his child, *Lambertus v. Santino,* 608 S.W.2d 502, 506 (Mo.App.1980), or express any willingness to share in the "burdens, sacrifices, and ofttimes pains of nurturing and caring for the child." *Matter of Adoption of Pearson,* 612 S.W.2d 30, 34 (Mo.App.1981). After exhaustive review of the transcript, we are satisfied that there was clear, cogent, and convincing evidence supporting the trial court's finding of willful neglect.

Given this finding of neglect, we find no basis in the law of Missouri for granting post-adoption visitation rights to the natural father. Although a few courts have granted visitation rights to unwed fathers (see cases cited in Anno., "Right of putative father to visit illegitimate child,"

15 A.L.R.3d 887; 10 C.J.S. Bastards § 17, at note 47), generally such rights have been granted only when provided by statute, or when the father has supported the child, or when clearly required by the best interests of the child. *Id.* No factors favoring visitation are present in this case.

Finally we consider the paternal grandmother's claim that she was entitled to intervene in the adoption proceeding in order to establish visitation rights with the child. Missouri law does not extend visitation rights to the natural grandparents of adopted children. *Aegerter v. Thompson,* 610 S.W.2d 308 (Mo.App.1980).

The decisions of the trial court are affirmed.

SMITH, P.J., and SATZ, J., concur.