701 S.W.2d 534 (1985)
In re ADOPTION OF BABY BOY W.
Keith C. WEISE and Connie S. Weise, Petitioners,
v.
W. and P., Respondents.
No. WD 36664.
Missouri Court of Appeals, Western District.
October 29, 1985.
As Modified December 3, 1985.
Motion for Rehearing and/or Transfer Denied December 3, 1985.
*536 Joseph P. Teasdale, Kansas City, Joseph J. Simeone, St. Louis, for petitioners.
William A. Shull III, Warrensburg, for respondents.
Gabriel A. Domjan, Harrisonville, Guardian Ad Litem for Baby Boy W.
Before DIXON, P.J., and SOMERVILLE and NUGENT, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied December 3, 1985.
DIXON, Presiding Judge.
This is an adoption proceeding. Petitioners, Mr. and Mrs. Keith Weise, appeal from the hearing court's findings which, in effect, denied petitioners an order transferring legal custody of the child in question to them. Petitioners have had physical custody of the child since five days after his birth, February 24, 1983. Their filing of a 2-count petition for the transfer of custody and adoption of the child initiated these proceedings.
Petitioners claim the circuit court erred in finding that: 1) the natural mother withdrew and renounced her "consent for adoption and voluntary termination of parental rights"; 2) the putative father did not abandon or neglect the child and retains his parental rights; and 3) the Interstate Compact on Placement of Children, § 210.620 RSMo 1978, was not complied with, thereby making the child's presence in Missouri illegal and improper. The child was born in and petitioners received actual custody from the mother in White County, Indiana.
In the summer of 1982, P., single, 18, and between her sophomore and junior years of high school, discovered she was pregnant. The father of the child was W., a 29-year-old man. P. lived with her father, Frank, and her step-mother, Lorraine, at the time of her pregnancy. Their household was in strained financial circumstances.
P. considered an abortion but could not afford one. A welfare representative discussed her options with her. Meanwhile, in September, Lorraine learned through a co-worker that "a Missouri couple" was interested in adopting a child, and she told the co-worker about P.'s pregnancy. The co-worker gave the information to the Missouri couple and suggested they contact the parents of P. On the day Mrs. Weise received the information, she contacted an attorney in Kansas City, John Barry, to see if such an adoption "was legal." Barry assured her it was. Mrs. Weise then called the telephone number sent to her by Lorraine's co-worker and spoke to Lorraine and Frank. Mrs. Weise did not reveal her name to Lorraine and Frank and told them at that time that any further contact with them would be made through an attorney.
Barry then contacted an attorney in Indiana, George Wildman. Barry advised Wildman that Barry had clients interested in adopting P.'s baby. Wildman contacted P. and her family, and P. came with her parents to his office on September 20, 1982. Wildman states in his deposition that although Lorraine probably did most of the *537 talking, P. did tell him that she was in school and wanted to continue her education, that she did not feel she would be in any position to care for the child, and that the father, W., was denying paternity. She wanted to consent to the adoption. Wildman explained to P. and her family that the adopting couple would take care of the "medical expenses and any expenses that would be associated with the pregnancy." On September 28, 1982, P. began seeing a Dr. David Shapiro for her prenatal care.
On November 16, 1982, P. signed a consent for adoption and voluntary termination of parental rights form in Wildman's office in the presence of Lorraine and Wildman's secretary. The secretary states P. had a positive attitude about the adoption and seemed sure about what she was doing.
On December 8, 1982, Wildman sent a registered letter to W. and enclosed a consent to adopt. Wildman was interested in knowing W.'s position on the paternity of the child. He received no response from W., however, a sister of W., N.L., did call Wildman's office. His secretary made the following memorandum of the call.
12-9-82
Re: W. adoption
W.'s sister called wanting to know if W. could sign consent after baby was born. He said if the baby was his, if it could be proven, that he wanted the baby. He told P. that he would marry her if the baby was his. If she didn't want it, he would take it if the courts would let him have it.
The sister called the office at least one other time to inquire about the proceedings. W., himself, never called Wildman's office.
On January 28, 1983, Wildman filed an adoption petition in the State of Indiana and had a notice issued to W. This petition was never acted upon, however, and was ultimately dismissed on March 28, 1983.
On February 24, 1983, P. gave birth to a male child. The next day, Wildman visited her in the hospital to obtain a post-birth consent for adoption. P. was quiet and had tears in her eyes. Wildman states in his deposition that he told her, "P., if you have any feelings about this adoption, that you don't want to consent to it, and you want me to leave the room I'll go and you don't need to say any more, all you have to do is say `Would you please leave' and I'll leave." P. told him not to leave and asked to see the consent. She read it. The consent read "female child" rather than "male child." The appropriate change was made, and P. initialed the change. Wildman read the consent aloud to her and asked if she was sure she wanted to sign it. She was. A notary was procured and P. signed the consent. Except for any glimpse she may have caught in the delivery room, P. never saw the child. On March 1, 1983, Mr. and Mrs. Weise picked the child up at the hospital and brought him to Missouri.
Wildman said that he always felt certain P.'s actions were voluntary and that she knew she was under no obligation to sign the consent. He dealt with both the Indiana and Missouri Interstate Compact offices regarding procedures and forms required in arranging the transfer. P. executed and signed all the applications the states require for taking a child from one state to another. Wildman filed in Indiana everything he filed in Missouri. There was some contact between the two states, but it was Wildman's impression that Indiana was "content to allow Missouri to call the shots as to what documents were required." Mr. and Mrs. Weise picked up the child at the hospital and took him to Missouri pursuant to the documents that P. had executed and the information that was turned over to the interstate agencies.
On March 2, 1983, W. filed a petition in Indiana to establish paternity of the child.
On March 16th a petition for transfer of custody and adoption was filed by petitioners in Cass County, Missouri, and a summons was issued to W.
On April 13, 1983, P. answered and joined in W.'s Indiana petition to establish paternity, custody, and child support. On that same day, the White County, Indiana, *538 Circuit Court issued an order declaring W. the child's father, declaring the child's name as C.W.W., ordering W. to pay $15.00 per week in child support to the Clerk of White County Circuit Court, giving P. custody of the child, and granting W. reasonable visitation rights. The order was entered without presentation of evidence or the presence of the parties. The court was not informed the child was outside the state in the custody of Mr. and Mrs. Weise, nor was it informed of the mother's consent to adoption, the proceedings under the Interstate Compact, or the proceedings pending in Missouri.
A motion for a continuance of the Missouri adoption proceeding was filed on that same day in Cass County, Missouri, on behalf of P. and W.
On April 22, 1983, P. filed a motion in the Missouri adoption for leave of court to revoke her consent to transfer of custody on the ground that her signing of the consent was "involuntary, non volitional and completely against [her will]; ... caused by extreme pressure, duress, and coercion from [her] parents and under threats of illegal and improper action by them and against [her]."
On June 30, 1983, respondents moved the court to set for trial Count I of the Weises' petition for custody and adoption and respondents' motion for leave of court to revoke consent to transfer of custody. On December 20, Gabriel Domjam was appointed guardian ad litem for the infant.
On December 21, 1983, the parties appeared and evidence was presented.
At the hearing, P. testified she had always wanted to keep her child. It was her parents and especially Lorraine who kept telling her that she had to give the child up because the family could not afford him. Her father once said "that he would beat the crap out of W." if she didn't sign the papers and if he ever caught W. talking to her, but she admits her father never threatened her personally. She had heard from other people that W. was denying the child was his but that didn't matter to her, she still wanted the child. She only signed the second consent because of her father's threat against W., her parents' refusal to support her, and because Lorraine kept saying, "Well, it's too late now. You can't change your mind now...." When she signed the consent she did not understand that that might keep her from ever seeing her child again.
She moved out of her parents' house "a day or so" after leaving the hospital so she could "fight for" her baby, and moved in with W.'s married sister, a mother of four. However, she acknowledged that she signed the Joinder in Petition to Establish Paternity, Custody, and Child Support about the time she moved out of her parents' home and that document was dated April 13, over a month after the child's birth.
Next Mrs. Weise testified. She explained how the connection with P. was made, and acknowledged that Lorraine was "real" concerned about hospital bills. Mrs. Weise and her husband had thought the adoption would take place in Indiana and then the attorneys told them it could be done in Missouri. She knew who W. was, but stated that "we were told all along that he said that he was not the child's father." "Up until the end," the Weises believed that.
W. testified. He admitted paternity of the child and stated he and P. were going to marry when she graduated from high school. He did not talk to P. during the pregnancy because "through the community" he heard P.'s father didn't want him on their property. He always knew he was the father of the child because "[he] had her out many times."
W. admitted he got a "paper" from George Wildman, but stated "I didn't say nothing, I just got ahold of my lawyer." When shown the letter on the stand, he acknowledged that he could not read it very well. Although he was laid off much of the time, he had told P. he would give her money if she needed it. He heard the child was in Missouri when he filed the "thing," but neither he nor his lawyer *539 knew where in Missouri, and he had his lawyer make contact with the Missouri agency. W. admitted that he dated another girl during P.'s pregnancy. When asked if he had ever been arrested, W. answered "sure." "[They] got me for drunkeness, drunken driving. They got me for eight bags of pot ... well, I had sold two bags is what I did." He also admitted he had been convicted for theft of a bicycle. He made no clear statement as to when he first learned of the adoption, but denied that his interest in the child was sparked by his sister. He also testified that he never denied "to anybody" that he was the father of P.'s child. He tried to visit P. in the hospital but "they wouldn't let [him] in." If he got the child back, P. and the child would stay at his sister's until P. graduated.
At that point the court received into evidence the depositions of Dr. David Shapiro, Lorraine, Frank, Kay Weatherwax, and George Wildman.
In his deposition, Dr. Shapiro states that he felt P. had a difficult time deciding exactly what she wanted to do about her baby. Toward the end of the pregnancy she had said she had decided but after she delivered she again seemed undecided. Ultimately, she decided "that she would indeed give the baby up for adoption." P. had stated "her parents were urging her to give the baby up for adoption."
P.'s stepmother said in her deposition that the subject of adoption came up after P. told her and Frank that she did not want the baby. Neither she nor her husband ever told P. that she had to give the baby away, but told her that she could "stay there and raise it and [they] would try to help her out as best [they] could." Lorraine claims she encouraged P. to keep the baby. When asked if she ever thought P. had doubts about the adoption, Lorraine replied, "Well, I think a few times she did, but then when I tried to call it off and everything she just went hysterical and told me ... `it was back on.'"
P. left home on March 15 of 1983 by leaving for school and never returning. Lorraine stated she has only seen P. three times since she moved out. One of those times was when W.'s sister and P. were moving P.'s clothes into W.'s house and W. didn't want her moving in. He threw her bags out the door and "slugged" his sister. The girls asked Lorraine to "smooth it out" with W. P. confirmed this incident in her testimony, except she stated W.'s sister was trying to move P.'s belongings out of W.'s house.
When asked if she would still like to see P. get the child, Lorraine said "no, ... because of things [P.] has said ... I just think it's better off where it's at." Lorraine claims P.'s statements that she was forced to sign the papers are "lies." P.'s decision to consent to the adoption was voluntary and was made without any pressure from her parents or from George Wildman.
In his deposition, P.'s father denies telling P. she had to do anything with the child. He didn't know how the family could afford it and he told P. if she kept the baby she'd have to find a job to help out. He denies ever having threatened W. in any way.
After the depositions were received into evidence, the court decided to proceed with the issue of neglect and abandonment.
The petitioners called Kathleen Barnett, a social service worker with the Division of Family Services in Cass County, to the stand. Barnett was the supervising worker on the placement of the infant in the Weise home. She described the Weises' relationship and their relationship with the child as "very loving, warm, accepting." She stated the child is totally accepted and loved and the bonding is as complete as can be in the infant-parent relationship. As a social service worker it was her opinion that the child feels so accepted and at home with the Weises that it would be detrimental to take him away from what he has grown up knowing. Barnett denied that the Division of Family Services had ever been contacted by either W. or P. since it obtained legal custody of the infant.
*540 Mr. Weise next testified. He identified the child as "Kevin," and described their relationship as close and playful. He further stated that he loves the child as much as or more than he could a natural child. When they found out they would be getting a baby, he and his wife moved from a four-level house to a one-level house in the country. They have set up a bank account for the child.
Connie Weise again testified saying the child's "just a part of me, and he's my son. We got him at the hospital and I have taken care of him and wehe is crazy about me." "He doesn't want to leave me. He holds on to me and stays holding on. And he is my son." She has not worked since the child was born.
P. was then questioned by the guardian ad litem. It was brought out that the support money paid by W. had gone into an account in P.'s name, and while some of the money has been spent, none of the funds have been spent for the child. The Indiana Court which awarded her custody was not advised by her or anyone else that she did not have physical custody of the child at the time of that hearing.
The guardian ad litem, in closing, recommended to the court that the child would be better off physically and emotionally if he remained with the Weises. In the event the court would not proceed with the adoption, the guardian requested the court to place custody with the Division of Family Services until an investigation could be made of the natural parents by Indiana Social Services since neither of the natural parents was employed and neither had ever had custody of the child.
On November 15, 1984, eleven months after the hearing, respondents' attorney filed a motion for disposition of the cause. On December 17, 1984, the court participated in a telephone conference call with the attorneys for both sides. The motion for ruling was granted. The court granted the request of the parties to file briefs in the matter no later than December 24, 1984, and January 4, 1985, respectively, for petitioners and respondents.
On January 11, 1985, neither party had filed a brief and the court made an entry as follows:
The Court finds that the parental rights of neither natural parent have been terminated. Ct. finds that the natural father did not abandon said child, or sign a consent to termination or adoption, and his parental rights to this child remain intact. The court finds that the natural mother signed a "consent for adoption and voluntary termination of parental rights" on 25 Feb. 83, but that she subsequently withdrew said consent and renounced it. The court further finds that the Interstate Compact on Placement of Children, 210.610 RSMo et seq. [sic] was not complied with, and said child is illegally and improperly in the state of Mo. The court orders the Mo. Div. of Family Services, Cass County to take said child into its custody and this court hereby places custody with Cass County DFS for delivery of said child to the proper authorities in White County, Indiana from whence said child came for disposition by the proper Indiana Agency.
On January 22, 1985, the court signed an order which was dictated on the 22nd, specifically stating the time for appeal would run from the 22nd. This order followed in substance the docket entry set forth above. That same day petitioners moved for an order setting bond and a stay of execution of the judgment. On January 23, 1985, notice of appeal was filed in the circuit court.
Before the issues presented may be considered, some procedural difficulties must be addressed. When the hearing was conducted in December of 1983, it was initiated on the basis of a hearing to consider a motion filed by the natural mother to revoke her consent. At some point the court directed that the issues of neglect and abandonment be taken up. No party objected to this procedure. On January 11, 1985, over twelve months later, the court *541 entered a written order in its docket sheet.[1] That order found that the natural father had not abandoned the child, the mother had withdrawn and renounced her consent, and "the Interstate Compact for the Placement of Children § 210.610 RSMo et seq. [sic] was not complied with and said child is illegally and improperly in the State of Mo." The court further directed that the child be placed in the custody of the Division of Family Services for "delivery" to the "proper authorities" in White County, Indiana. There was no ruling as to the claim of custody by the adoptive parents nor any ruling as to the alternative ground of the father's neglect which if found would obviate the need for his consent. The order does not even address the issue of permission to revoke the consent, but assumes that fact. The trial court apparently apprehended the difficulty and attempted to enter an order "nunc pro tunc" "dismissing" Counts 1 and 2 of the Weise petition. During oral argument, the validity of this order was questioned, and respondents concede it had no effect.
This procedural ineptitude in the entry of the judgment might very well be considered fatal to the finality of the adjudication. A dismissal of this appeal for lack of finality in the judgment would simply add more delay to what is already an intolerable showing of judicial dilatoriness. What was said in a comparable situation applies here as well.
This District has never taken a highly technical position on the lack of a final judgment for the purposes of finality for appeal where the record as a whole shows a disposition of all the issues and the parties. This more liberal position in examining trial court judgments for finality has, as in the instant case, required extensive analysis and judicial writing to overcome unnecessary difficulties posed by the failure of the litigants and trial judges to be attentive to the drafting and entry of judgments. It may well be that if litigants and the trial bench fail to provide appropriate judgments for review by this court, a narrower and more technical view must be adopted by this court to prevent a waste of judicial effort at the appellate level resulting from a lack of diligence at the trial level.
Viewing this record upon the basis of the more liberal view this District has adopted, it is concluded the issues have been resolved. The record makes plain what the plaintiff has gained and the defendant lost by reason of the widening of the way. This case has been pending five years. The record in this case, even if supplemented by a more complete judgment entry, would still require a reversal. Nothing is to be gained by remand for entry of a formal judgment.
Reid v. Jones, 594 S.W.2d 339, 341-42 (Mo. App.1980).
For the purpose of this appeal, the trial court judgment is construed as an order denying transfer of legal custody to petitioners and dismissing the adoption count of their petition. Review will be based on the allegations of trial court error raised by the Weises.
The trial court has found that the child is illegally and improperly in the State of Missouri by reason of a failure to comply with the Interstate Compact on Placement of Children (Compact), § 210.620, RSMo 1978. Based upon that finding the trial court ordered:
[T]he child is placed in the custody of the Division of Family Services for the sole purpose of delivery of said child to the proper authorities in White County, Indiana, from whence said child was illegally transported to this state, for disposition of said child by the proper Indiana agency or authorities.
The Weises contend this order of the trial court is improper. The record simply does *542 not support the trial court's finding with respect to this matter. The only evidence in this record concerning the Interstate Compact on Placement of Children was evidence of compliance with the provisions of that Act. The social worker for the Division of Family Services in Cass County indicated that supervision of the child's placement and investigation of the adoptive parents was undertaken at the direction of the administrator of the Compact for the State of Missouri and the undisputed evidence of attorney Wildman was that all documents necessary for compliance with the relevant statutes had been forwarded to the authorities in Indiana and Missouri. Wildman further stated that apparently Missouri had undertaken the lead role in compliance with the Compact and that the State of Indiana was passive in the placement of the child. Upon what basis the trial court found a violation of the Compact is no where explicated.
The initial inquiry must be whether the Compact applies to this placement. The Weises did not obtain the child from any public agency. This was a private placement by the mother with her consent to adopt. There is a viable issue whether the Compact applies to a private placement. Only one court appears to have considered the question and it held that the Compact does not apply to private placements. In re Adoption of M.M., 652 P.2d 974 (Wyo. 1982). Thus, before any determination can be made that anyone has violated the Interstate Compact, there must first be a determination whether the Compact in fact applies to the instant case.
The next issue urged for reversal of the trial court judgment is the contention that the trial court should not have permitted the mother to revoke her consent.
The court's power and duty in the premises arises from § 453.050.2, RSMo Supp. 1984. In pertinent part, § 453.050.2 reads:
Any waiver mentioned in subdivision (3) of section 453.040, or the written consent to adoption by any parent, shall be valid and effectual even though such parent was under the age of eighteen years at the time of the execution thereof, and any such waiver or consent shall be irrevocable without leave of the court having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties.
The court's obligation in this case was to exercise its discretion to permit the consent to be withdrawn or to refuse the attempted revocation. The court's order as framed simply does not address the issue but assumes some basis for revocation aside from the statute. Presumably the court concluded that the mother's contention that she had executed the consent under duress was proven. Assuming without deciding that proof of duress would justify revocation, the trial court's order is without any substantial evidentiary support and, in fact, is contrary to the weight of the evidence. Under the rule of Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976), a finding of the trial court which is against the weight of the evidence is to be set aside when the reviewing court is firmly convinced the judgment of the trial court is wrong. Review of this record leaves not the slightest doubt that the trial court judgment was wrong. The only evidence even suggesting duress was the natural mother's assertion that her father said that if she "didn't sign the papers and if he ever caught [W., the natural father] talking to [her] or anything" "he would beat the crap out of W." The evidence was objected to as hearsay, and the trial court admitted it with the following curious comment:
And the Court will find that this is exception to the hearsay rule and that it's being offered not for the truth of what was being said but for the fact that the statement was made. So for that limited purpose it will be admitted.
The evidence could not have come in under the "verbal acts" doctrine because the utterances did not accompany any ambiguous or equivocal act, itself material, which needed the statement to complete the act and give it legal significance. Menorah Medical Center v. Davis, 463 S.W.2d 618, 621 (Mo.App.1971). If it was offered to *543 show a state of mind, it was admissible to show the state of mind of the declarant the witness's father. State v. Singh, 586 S.W.2d 410, 418 (Mo.App.1979).
In any event, the facts contained in the statement are not proven under the court's ruling. The father and the stepmother denied any such threats. When queried as to her reason for wanting to withdraw her consent, the mother stated she wanted her baby. She had simply changed her mind. The lawyer who obtained the consent testified fully as to the circumstances surrounding the signing of the consent, and the voluntariness of the consent is patent. The father of the natural mother, the stepmother, the lawyer, the lawyer's secretary, and the attending physician all testified by deposition. There is no credibility issue as to their testimony and this court is not bound to defer to the trial court on an issue of credibility in such circumstances. In re Estate of Wintermann, 492 S.W.2d 763, 767 (Mo.1973); Giokaris v. Kincaid, 331 S.W.2d 633, 635 (Mo.1960). Viewing the evidence as a whole, there is nothing to support the trial court's action in finding the consent was revoked. If the order is considered as permission to revoke the consent, which is otherwise irrevocable under the statute, there is no basis for the court's exercise of discretion in the circumstances. Such permission should not have been granted.
Petitioners likewise challenge the finding of the trial court that the consent of the natural father is required. It is their position that the evidence shows both abandonment and neglect of the child by his natural father. They assert that the evidence of the natural father's failure to care for the mother during her pregnancy and his denial of paternity are sufficient to show his intent to abandon the child, and that such acts also constitute neglect. They also urge that a finding of either abandonment or neglect on the part of W. would justify the court in finding that his consent was not required to permit the transfer of custody to the Weises.
The court's order set forth above addresses the issue of abandonment only and not the alternative of neglect. Both abandonment and neglect were pleaded. There was evidence presented bearing upon both issues. The court's order concludes that there was no abandonment by the natural father. There is no conclusion as to neglect.
Abandonment and neglect are different concepts. Abandonment has been defined as a willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of custody of the child to another with the intent to never again claim the rights or duties of a parent. In re Trapp, 528 S.W.2d 489, 495 (Mo.App. 1975). It can also occur if a parent intentionally withholds from the child without just cause or excuse the care, love, protection, and presence of a parent. In the Matter of Adoption of Richards, 624 S.W.2d 483, 486 (Mo.App.1981); In Re Watson's Adoption, 238 Mo.App. 1104, 1113-1114, 195 S.W.2d 331, 336 (1946).
The latter definition of abandonment is not, in reality, a different concept from the former. Rather, the definition is a statement of a set of facts which prove abandonment after the fact. In many cases of abandonment, the initial transfer of custody cannot satisfy the concept of a voluntary and intentional relinquishment of custody with an intent to never again exercise the rights or duties of a parent. Nonetheless, a transfer of custody for any reason may ripen into abandonment if the absent parent foregoes the performance of the functions of a parent which demonstrate the continued intent to exercise the rights and duties of a parent. Whatever the genesis for the transfer or relinquishment of custody, an abandonment may result if the parent not in custody evidences an intent to abandon by the subsequent conduct.
Neglect, on the other hand, connotes a physical deprivation or harm. It is a failure to perform the duty with which *544 the parent is charged by the law and by conscience. Adoption of Mike and Russ, 553 S.W.2d 706, 708 (Mo.App.1977). Classic examples of parental neglect to provide a child with necessary care and protection involve the failure to provide care by way of clothes, food, and physical supervision. In adoptive situations, particularly stepparent ladoptions, neglect is found in a failure to provide support whether ordered by judicial decree or not. Adoption of R.A.B. v. R.A.B., 562 S.W.2d 356, 361 (Mo. banc 1978); Lambertus v. Santino, 608 S.W.2d 502, 504-505 (Mo.App.1980); Kambitch v. Ederle, 642 S.W.2d 690, 693 (Mo.App.1982).
While neglect might be found in the instance of a custodial parent, abandonment requires the relinquishment of custody. Abandonment, if found, includes the concept of neglect by omission of parental duties. If abandonment is not found, that does not preclude an alternative finding of neglect. Because of the nature of the concepts and the infinite variations of fact in which they are applied, there is some confusion in the cases as to the appropriate term. There is a necessity for the separation of the terms as the instant case demonstrates.
In the instant case, the father never had custody and could not have relinquished it or transferred it. Abandonment could only be predicated upon his conduct with respect to denying paternity of the child and in not seeing the child for the very short period before the petition was filed, or in his failure to attempt to communicate with the child after the petition was filed. These facts might lead a court to find an intent to abandon. On the other hand, the trial court cannot be faulted for finding that the father did not abandon the child.
The issue of neglect likewise turns upon the intent with which the acts were performed and, like most findings concerning mental state, is an inference from all the facts. Lambertus v. Santino, 608 S.W.2d at 505-506. In the instant case, there was ample evidence to support a finding of neglect and the necessary willfulness and intent which must accompany that finding. The natural father did not see the mother at any time during her pregnancy, or if he did so, it was occasionally and inadvertently. There is a strong inference that he denied paternity of the child. He made no attempt to provide the mother with prenatal care to protect the lives of both the mother and the child. He did not see the child and only after the mother had relinquished the custody of the child to the Weises did he make any effort to assert his parental rights.
It is true that the father is entitled to a presumption of fitness when he has fathered an illegitimate child and that that presumption will be the same as the presumption afforded to the father of a legitimate child. State ex rel. J.D.S. v. Edwards, 574 S.W.2d 405, 409 (Mo. banc 1978). That right carries with it the obligations that correspond to the right. A natural father of an illegitimate child may claim parental rights just as the father of a legitimate child may, but his duty will likewise be measured by what the law expects of the father of a legitimate child. Measuring the natural father's conduct against this standard, and considering the inference of intent that arises from his conduct, there is evidence of neglect. He paid child support payments which he knew could not be benefiting the child because the mother was receiving them in Indiana while the child was in Missouri. The inference is P. was using part of the money for her own benefit. He has failed to make any real effort to maintain contact with the child other than delegating to his lawyer the locating of the child and the pursuit of the legal proceedings. All of this may be considered in determining the intent of the father as to the acts of neglect shown. This court does not determine that issue and cannot determine that issue in the absence of a finding by the trial court. The evidence is set forth solely to indicate the importance of the trial court's conclusion only on the issue of abandonment and to demonstrate that the trial court's failure to find on the issue of neglect could not have *545 been based on any lack of evidence to show such neglect.
Section 453.040(4), RSMo Supp. 1984 is disjunctive. Either abandonment or neglect will obviate consent. Matter of adoption of Pearson, 612 S.W.2d 30, 35 (Mo.App.1981). The statute in its alternative and disjunctive provisions is jurisdictional. That is to say the proof must exist to support a conclusion by the court that the parent either abandoned or neglected the child before the court can act without the consent of that parent. Matter of Adoption of G., 618 S.W.2d 462, 466 (Mo. App.1981); Adoption of R.A.B., 562 S.W.2d at 357. As a necessary corollary when there is pleading and proof as to both abandonment and neglect, a judgment as to both must be made. As noted, to find that there was no abandonment does not preclude a judgment of neglect. The trial court's conclusion that a lack of no abandonment necessitated the father's consent was erroneous because it was not based upon the necessary additional conclusion that the father had not neglected the child.
The trial court assumed consent was required if the court found either no abandonment or no neglect. In fact consent was required only if the court found neither abandonment nor neglect. The trial court has thus committed an error of law by assuming abandonment includes neglect. Under the standards of Murphy v. Carron, 536 S.W.2d at 32, a trial court judgment will be reversed when it contains an error of law. As the Supreme Court said in a similar situation:
It may well be that on remand the finding can be made that the period of abandonment continued to the date of the filing of the petition. But that is for the trial court's determination. Any other ruling would result in bad law and speak words contrary to those specifically written by the General Assembly. Any other ruling would also clash directly with that stalwart standard of judicial appellate review, Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976), for in this case there has been a clearly erroneous application of the law and no way to get around it.
In re Adoption of W.B.L., 647 S.W.2d 531, 534 (Mo. banc 1983).
The child is now physically present in the State of Missouri and is lawfully in the custody of the Division of Family Services of the State of Missouri under the order of Judge Gum entered April 18, 1983, transferring custody to the Division.
The trial court also entered another order transferring custody to Division of Family Services and stating it was for "delivery of said child to the proper authorities in White County, Indiana ... for disposition by the proper Indiana Agency." This latter order is improper. The court assumed the jurisdiction and placed custody in the Division of Family Services. No one contests or complains of that order. The Juvenile Court of Cass County continues to have jurisdiction of this child. All of the parties asserting any claim have submitted to the jurisdiction of the court and do not contest the jurisdiction. Having assumed jurisdiction and acted, the court cannot relinquish jurisdiction by delegating authority to the Division of Family Services to determine who shall have custody of this child.
There is in this record a copy of an order of the Circuit Court of White County, Indiana, purporting to transfer custody to the natural mother and granting to the natural father visitation rights, determining his paternity, and directing the payment of child support. Whatever effect that judgment may have between the parties to the judgment, the natural father and the natural mother, it can have no effect upon the custody of the child as it may relate to other parties. Significantly, the natural father does not assert it as a basis for relief. Both Missouri and Indiana have adopted the Uniform Child Custody Jurisdiction Act (Act), § 452.440 to 452.550, RSMo 1978; IND.CODE ANN. 31-1-11.6-1 to 31-1-11.6-24 (Burns 1980). Under that Act, the parties were required to disclose to the Indiana court the fact that the mother had consented to the adoption of the child, and that she had transferred his custody to Mr. and Mrs. Weise, and that the child was *546 in the State of Missouri. §§ 452.480, 452.485, RSMo; IND.CODE ANN. §§ 31-1-11.6-9, -10. The petition in the Indiana court, an exhibit in this case, falls short of the requirements of the Act in many respects, see § 452.480, RSMo and IND.CODE ANN. § 31-1-11.6-9, and the jurisdiction of the Indiana court is very dubious. Under the law, a summons should have been issued to Mr. and Mrs. Weise, and they should have been made parties to the Indiana custody action. § 452.485, RSMo and IND.CODE ANN. § 31-1-11.6-10. The Indiana judgment entered by the court without any knowledge of the status and location of the child and while the adoption proceeding was pending in Missouri cannot afford a proper basis for an order transferring custody to the natural father, nor can it provide a basis for that court assuming jurisdiction of this child.
By reason of the foregoing, it is necessary to reverse the order entered below and to remand this case to the Juvenile Court of Cass County, Missouri, with directions to forthwith conduct a new trial on all the issues.
All concur.
NOTES
[1] No explanation appears for the over-one-year delay in the court's ruling. A ruling was made only after the intervening natural parents filed a motion requesting a ruling. Such a delay in a matter involving custody of a baby is inexcusable. Courts should by some form of internal monitoring avoid such extended delays, particularly in the disposition of child custody cases.