562 S.W.2d 356 (1978)
In the Matter of the ADOPTION OF R. A. B., III, et al., J. A. H. and S. J. H., Petitioners-Respondents,
v.
R. A. B., Jr., Appellant.
No. 59990.
Supreme Court of Missouri, En Banc.
March 13, 1978.
*357 Karl W. Blanchard, Jr., Blanchard, VanFleet, Martin, Robertson & Dermott, Joplin, for appellant.
Dean S. Johnston, Joplin, for petitioners-respondents.
RENDLEN, Judge.
Transferred from the Springfield district of the Missouri Court of Appeals after opinion, this case is decided as though on original appeal. Mo.Const., Art. V, § 10. The natural father, R. A. B., Jr., appeals from the adoption decree terminating the parental rights to his three children, ages nine, eight and six at the time of trial, and awarding them by adoption to his divorced wife (the natural mother) and her present husband, petitioners in this action. We reverse.
Consent of a natural parent is required for adoption of children under twenty-one years of age, § 453.030(3), RSMo 1969, except for special cases enumerated by statute, § 453.040. One such exception applicable here is found in § 453.040(4):
"The consent of the adoption of a child is not required of . . . (4) A parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance. . . ."
In their joint petition filed July 11, 1974, the natural mother and stepfather alleged the natural father willfully neglected to provide the minor children with proper care and maintenance for a period of at least one year immediately prior to the filing of the petition. No claim is made that he abandoned the children.
Adoption proceedings in Missouri are governed by statute, In the Matter of D. G. K. v. D. G. K., 545 S.W.2d 81, 82 (Mo.App. 1976), and while it is often said that the welfare of the child is the paramount consideration in an adoption proceeding, questions regarding the fitness of the petitioners and the child's welfare are not reached if willful abandonment (here neglect) is not proved, In re E. C. N., 517 S.W.2d 709, 712 (Mo.App.1974), because consent or the proper waiver of consent under § 453.040 is jurisdictional, In re D., 408 S.W.2d 361, 365 (Mo.App.1966). "Willful *358 neglect" as used in the statute has been construed to mean neglect that is " . . . intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego . . . parental duties over the period of time which the statute prescribes.. . ." In re E. C. N., supra at 712. The conduct of the parent constituting willful neglect or abandonment must have occurred during the year immediately preceding the filing of the adoption petition, In Matter of D. G. K. v. D. G. K., supra at 81-82, and as stated in In re Adoption of Rule, 435 S.W.2d 35, 40 (Mo. App.1968): ". . . the conduct of the parent must evidence an intent or mental attitude to forsake the status of a parent at least for the period of time declared in the statute. . . ." However, abandonment and neglect are matters of intent and "evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent. . . ." In re Adoption of K., 417 S.W.2d 702, 709 (Mo. App.1967).
In this case, the natural father (hereinafter R.) and the natural mother (hereinafter S.) married in 1964 and the following year, while living in Pittsburgh, Pennsylvania had their first child. The second child was born in 1966 and the third in 1968. The family lived in Pittsburgh until March, 1971, when the parents separated. During that time they had serious financial difficulties and R. went to Ohio for about six months but returned to Pittsburgh where S. had continued to live in the family home with the children. During the summer of 1971, R. sold two small businesses which he had operated during his marriage and realized about $3,500 from the proceeds of that sale. He testified this money was given to S., but she maintained she had received nothing and the trial court in its findings accepted her version of those facts. After the businesses were sold, R. did not work for about one year and on November 22, 1972, a divorce was granted in Pennsylvania but the decree failed to mention the children, their custody or support. Between the time of separation in March, 1971, and the divorce in November of 1972, R. visited the children whenever he was in town though "it was not set up on a regular basis." While in Pittsburgh, S. continued to live in and occupy the furnished home which the couple had purchased and during that difficult financial period she received welfare payments in the amount of $235 a month. The monthly mortgage payments on the Pittsburgh home were $151.00 and S. "occasionally made those payments." On the other hand, the father of R. made some of the payments but according to S., "quite a few months they were not paid."
In May of 1973, R. married B., a registered nurse, and with his new wife moved to New York where he entered a school described as "a culinary institute." He attended classes regularly at the "institute" through December, 1974. During the latter part of the summer of 1973, S. visited in Missouri and apparently it was then she met her future husband (hereinafter J.). While she was there, the children spent two weeks with their father and his new wife at their home in Red Hook, New York. It was admitted that the children "seemed to enjoy the visit" and there is no dispute that while in New York the children's father provided their support and that this two week visit occurred within the statutory year referred to in § 453.040(4). The children's mother also admitted that during the period of separation, R. constantly expressed an interest in the children and would from time to time provide them with gifts and clothing. Further, S. testified that she was sure appellant loved the children. The following testimony elicited from the natural mother is pertinent to these matters:
"Q. Is it your opinion then that [R] loves these children.
A. Yes, I'm sure he does.
Q. Cares very much for them.
A. I'm sure he does."
Thereafter, testimony relative to R's failure to support the children was developed.
"Q. Have you ever asked [R] for any support?
A. No, I haven't.

*359 Q. You've never made any demand on him for the children.
A. I have told him we didn't have money, but I knew he didn't have any.
Q. How did you know he didn't have any?
A. He wasn't working.
Q. Did you know that during the last year and one-half he has been going to school?
A. Yes, he told me he was.
Q. In fact you acknowledged the fact in the August 14, 1973, letter.
A. Yes.
Q. In fact, going to school in New York at the time the children stayed with him; is that right?
A. Yes.
Q. Has your [present] husband [J] ever made a demand for support money for the children from [R]?
A. No, he hasn't.
Q. So, in fact until you moved to Missouri, the relationship simply was that [R] did not have much money and you were on welfare and you were both getting along the best you could and never any order or demand for support.
A. Yes.
* * * * * *
Q. Mrs. [S] when you left Pittsburgh, did you, in fact, leave a large number of bills behind?
A. Yes, there were bills.
Q. Is it not true that [R] took care of these bills for you?
A. I have no idea.
Q. You just left the bills?
A. Yes."
In this connection R. testified, and it is not disputed that he did in fact take care of the bills which approximated $2,000 after she left Pennsylvania for Missouri in October, 1973, and that this occurred well within the one year statutory period. Appellant testified to these matters as follows:
"Q. [R], when [S] moved from Pittsburgh to Missouri, did she leave a substantial number of bills in the Pittsburgh area?
A. Yes.
Q. How were those bills disposed of?
A. Me.
Q. Do you have any idea
A. There are a few bills still in debate with major department stores.
Q. Do you have an estimate as to what the total amount of bills were?
A. That I paid off? I would say, approximately $2,000. I used most of my entire savings."
It is also undisputed that S. took an automobile from Pennsylvania to Missouri which previously had been subject to a mortgage indebtedness that had been paid by her former husband. She also admitted that R. and his present wife contributed two or three chairs to her house on Francis Street in Pittsburgh and which she took for her own use in Missouri.
In August of 1973, shortly after the children visited with their father in New York and just before she moved to Missouri with the children, S. wrote a cordial letter (Respondent's Exhibit No. 1) to her former husband and his new wife stating, "I am so glad to hear how well you're doing in school. You should be very proud of yourself. I know that things are rough, but everything is going to be fine. . . . Good things, or rather, beautiful things happened for me this summer and for my future." The latter statement is apparently a reference to the fact she had met her new husband that summer, whom she married in November one month after moving to Missouri. On that subject she noted in the letter, "The kids have a good outlook on you [sic] being married and they don't mind the idea that I may get married someday. Thank you for that. I don't want to live by myself forever and I wouldn't want to hurt them. But, now it seems that they understand and I feel so much better." (Emphasis supplied.) She acknowledged that the time their son had spent with his father in Red Hook, "was good for him." The letter closed with the statement that she was happy school was going well for R. and that *360 he had been able to start a good life with his new wife, congratulating him on having attained the status as an honor student. She also mentioned in the letter to her former husband that he had been correct in his appraisal of a problem concerning the legs and need for special shoes for one of the children. Though we are not told the details, it is apparent from respondent's letter that appellant demonstrated a real concern for the child's welfare. In her testimony, respondent admitted that during the two year period of separation before the divorce, her then husband (appellant) constantly expressed an interest in the children, that he would bring them gifts and clothing and would attempt to see them whenever he was in town.
In October of 1973, S. moved to Missouri and one month later married J. As noted above, in late July or August (eleven months prior to the filing of the petition) the children spent two weeks with their father, and in December of 1973 (seven months before the petition was filed), R. and his wife drove from Red Hook, New York to Newton County, Missouri and after some difficulty located his former wife's residence. He brought gifts of clothing and other presents and was allowed to visit in respondent's trailer home on two occasions. In March, 1974, four months prior to the filing of the adoption petition, appellant again came from New York to Missouri where he was allowed to visit the children on only one occasion and not outside the trailer home. Apparently an altercation developed between the parties including J. (the new husband) and appellant during which appellant complained that he wasn't allowed reasonable visitation with the children and stated he intended to take custody of them.
In July of that year the petition for adoption was filed and during the following month appellant again came to Missouri and telephoned his former wife asking to visit the children. He was told he could visit the children at her mobile home but not elsewhere. She was asked: "Q. And we [sic] were not able to work out a satisfactory agreement, so he didn't see the children in August; is that right? A. Yes." Thus, during the period of one year immediately prior to the filing of the petition for adoption, the children had been with their father for a two week visit in his home in New York, he had been in correspondence with his former wife and had talked to her by telephone, he had made two trips at his own expense to Missouri bringing gifts and clothing on at least one of those occasions and had been permitted to visit the children only for three limited periods in the trailer home of the respondent and her new husband. When he complained of this, an adoption petition was filed; nevertheless he came to Missouri a third time in August but was effectively denied visitation privileges. Appellant filed answer and counterclaimed praying for an order granting him legal custody of the children or in the alternative that an order be entered granting him rights of reasonable visitation.
Adoption proceedings are governed by statute, Chapter 453, and this chapter is considered a code unto itself. In re Smith, 314 S.W.2d 464 (Mo.App.1958). It is well settled that as a matter of simple justice the adoption statutes are to be strictly construed in favor of the natural parents, In re Slaughter, 290 S.W.2d 408 (Mo.App.1956). These principles were discussed in In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686, 691 (1938), as follows:
"It is of course true that the statute is to be liberally construed with a view to promoting the best interests of the child, but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine. . . [I]t must always be borne in mind that the right of natural parents to the custody and possession of their children are among the highest of natural rights. . . ."
Section 14074, RSMo 1929, the predecessor to present § 453.040(4) was modified in 1947 to include the adverb "willfully" before the *361 verbs "abandoned" and "neglected." The prior statute, though not containing the term "willfully" before the verb "neglected" was construed to mean essentially the same as the present section. See In re Perkins, supra at 686, in which it was held, "the parent's consent to the adoption is not to be dispensed with upon the ground of his neglect of his child unless it is shown that such neglect was intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego his parental duties over the period of time which the statute prescribes."
The evidence in the case at bar was insufficient to support a finding of willful neglect during the statutory year. In so holding, we are mindful that our review of this non-jury case under Rule 73.01 is confined to the parameters described in Murphy v. Carron, 536 S.W.2d 30 (Mo.banc 1976), however we have a firm belief that the decree of the trial court is wrong. The manifestation of appellant's interest in his children recited above and his efforts to maintain his relationship with them during the statutory year prior to the filing of the adoption petition do not evince a settled purpose to forego his parental rights and duties. We are also aware that appellant apparently paid little or no money to the natural mother from the time of the separation and the divorce in 1972 until the adoption petition was filed in 1974. However many things were done and efforts made, including the payment of some $2,000 for bills the natural mother incurred in Pennsylvania, gifts and clothing for the children as well as the time spent and support provided for the children in New York, two trips to Missouri to visit the children before these proceedings began, and one shortly thereafter. These and other demonstrations of paternal interest occurring within the statutory year, are sufficient to warrant denial of adoption without consent of the natural father. We do not condone his failure to pay monies for support within the limits of his abilities; on the other hand, nothing appears to indicate the mother has attempted through the Pennsylvania courts or in Missouri under the Uniform Support of Dependents Act or other appropriate action to collect support monies from him. Instead when appellant asserted his rights to visitation, respondent and her new husband petitioned for adoption.
Finally, though the Pennsylvania divorce decree is silent as to custody of the children and no provisions are made for their support, such does not relieve the natural father of his primary and continuing duty to support the children. His is a continuing duty to support and on the other hand the mother shares that duty and as custodian has the responsibility of working toward a reasonable arrangement for the father's visitation with the children.
The out-of-custody father is entitled to assurances that his letters, presents and reasonable attempts to communicate and visit with his children will be honored without disparagement by the mother or her new husband. The decree of the trial court awarding adoption is reversed.
All concur.