786 S.W.2d 898 (1990)
G.S.M. & L.M.M., Petitioners-Appellants,
v.
T.H.B., Respondent.
No. 55671.
Missouri Court of Appeals, Eastern District, Division Three.
March 20, 1990.
*899 Richard Wolff, St. Louis, for petitionersappellants.
Leah B. Haub, O'Fallon, for respondent.
SATZ, Presiding Judge.
This is a stepparent adoption. The natural mother, stepfather and guardian ad litem appeal the trial court's denial of the petition for adoption. We reverse and remand with directions.
Petitioners are the natural mother and the stepfather of R.M.B., a girl, born August 27, 1982. The natural father is the respondent. On September 1, 1983, the natural parents were divorced and the mother was awarded custody of the child. The father was granted reasonable visitation rights and required to pay $30.00 per week as child support.
Petitioners were married on August 8, 1984. The child has lived with petitioners continuously since the date of their marriage.
On March 8, 1987, petitioners filed their petition for adoption, alleging that the natural *900 father had willfully abandoned and willfully neglected the child for a period of at least six months immediately prior to the filing of the petition. In his answer, the natural father denied these allegations.
In a stepparent adoption, either willful abandonment or willful neglect of the child by the non-petitioning natural parent obviates the need for that parent's consent to the adoption. § 453.040(5) RSMo 1986; e.g., In re Adoption of H, 712 S.W.2d 726, 727 (Mo.App.1986). The critical period is the six month period immediately prior to the date the petition for adoption is filed. § 453.040(5) RSMo 1986.[1]
Abandonment and neglect are different, but not mutually exclusive, concepts. See, In re Adoption of Baby Boy W., 701 S.W.2d 534, 543 (Mo.App.1985). Abandonment has been defined as the "voluntary and intentional relinquishment of custody of the child with the intent to never again claim the rights or duties of a parent," Id. at 543, or, as the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse. In re E.C.N., 517 S.W.2d 709, 715 (Mo.App.1974); In re Watson's Adoption, 195 S.W.2d 331, 336 (Mo. App.1946).
Neglect, on the other hand, normally focuses on physical deprivation or harm. It is primarily a failure to perform the duty imposed upon the parent by law and by conscience. Adoption of Mike and Russ, 553 S.W.2d 706, 708 (Mo.App.1977). In stepparent adoptions, it quite often is shown by a failure to provide support, without just cause or excuse, whether ordered by judicial decree or not. See, e.g. Baby Boy W, 701 S.W.2d at 544, and cases cited therein.
The issue of abandonment or neglect turns on intent, which, more often than not, is an inferred fact, determined by conduct within the statutory period, Matter of T.C.M., 651 S.W.2d 525, 529 (Mo.App. 1983), along with relevant conduct both before and after this period. Adoption of R.A.B. v. R.A.B., 562 S.W.2d 356, 358 (Mo. banc 1978). The proof of this intent must be shown by clear, cogent and convincing evidence. T.C.M., 651 S.W.2d at 530-31. To determine whether the proof was shown in a court-tried case, we defer to the trial court's determination of credibility, Rule 73.01, and we accept as true the evidence and permissible inferences favorable to the judgment and disregard all contrary evidence and inferences. Snowden v. Gaynor, 710 S.W.2d 481, 483 (Mo.App.1986). Moreover, we affirm the judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).
In establishing this standard of review in Murphy v. Carron, the Court expressly rejected both a review "de novo" and a review based upon a "clearly erroneous" standard. Id. In doing so, the Court admonished "[a]ppellate courts" to "exercise the power to set aside a decree or judgment on the ground it is `against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." Id. The precise differences between appellate review by "weighing the evidence" and appellate review "de novo", however, are not easily determined, and it would be idle to try to define those differences here.
Suffice it to say, we follow the stated guidelines as we understand them. To do so requires us to presume the trial court chose to believe the respondent natural father and to disbelieve both of the petitioners. *901 We have done so. Nevertheless, we find the trial court's judgment to be against the weight of the evidence, and we have the firm belief that judgment is wrong.
Our findings and belief turn on the evidentiary burdens of the parties. In a stepparent adoption, like the present one, the petitioners have the burden of proving the existence vel non of a condition obviating parental consent by clear, cogent and convincing evidence. Tomlinson v. O'Briant, 634 S.W.2d 546, 551 (Mo.App.1982). However, no Missouri case we have found discusses what the petitioners must do to meet their burden. A sensible allocation, we believe, permits the petitioners to establish a prima facie case of willful neglect by showing, with clear and convincing evidence, that the natural father had a duty to pay child support and failed to do so. Once a prima facie case is made, the burden of going forward with the evidence shifts to the natural father who must show why his failure to pay support was not willful. If he does so, the petitioners must still prove by clear and convincing evidence that the natural father's explanatory evidence was pretextual or not reasonable and, thus, his failure to pay support was willful.
This allocation of the evidentiary burdens in stepparent adoption is not unusual. See, Annotation, Natural Parent's Indigence as Precluding a Finding That Failure to Support Child Waived Requirement of Consent to Adoption, 71 ALR 4th 305, 321 (1989). Moreover, it is a sensible allocation of the evidentiary burden for several reasons. First, the reason a natural parent fails to make a support payment is information that is peculiarly available to the natural parent. See In re Marriage of Vanet, 544 S.W.2d 236, 245-46 (Mo.App. 1976). In such a circumstance, requiring petitioners to prove the absence of justification places an unfair burden on them. D.L.J. v. W.D.R., 635 P.2d 834, 838 (Alaska 1981). In addition, requiring the petitioners to prove the natural parent was without justification would be akin to requiring them to prove a negative. In re Adoption of Masa, 23 Ohio St.3d 163, 492 N.E.2d 140, 143 (1986). Finally, we note the trial court in the original divorce action concluded the natural parent was able to make the payments ordered in the divorce decree. Vanet, 544 S.W.2d at 246. Given this fact, we believe the burden should be on the natural parent to at least go forward with evidence showing the failure was not willful. Compare Vanet, at 245-46.
In the present case, there is no question that the natural father never paid any child support. Therefore, it became his duty to go forward with evidence showing why his failure was not willful. To do so, he must, at least, show his failure to provide support payments was beyond his control. This focuses on several factors which include both his ability and willingness to earn an income, his willingness to support his child, and his use of his funds to provide himself only with the bare necessities of life prior to providing support for his child. See e.g. Forhan v. Forhan, 693 S.W.2d 164, 166 (Mo.App.1985). In the present case, the natural father did not do so.
Even viewed in its most favorable light, the natural father's testimony is still rambling, imprecise and, at times, inconsistent. Apparently, he remained in the metropolitan St. Louis area from the time of the dissolution in September 1983 until December 1983. From then until the fall of 1984, he lived in Minneapolis, Minnesota. In January 1985, he returned to St. Louis, then moved to Waynesville, Missouri and remained in that area until the time of the hearing on the adoption.
During his direct examination, the natural father admitted he had never made any child support payments. Without reference to any specific period of time, he explained this failure by saying he had been unemployed for "most of the time", he was "on public assistance from time to time", and he had suffered a back injury on one job which made it virtually impossible for him to earn a living. In an answer to *902 an interrogatory read into evidence, he said he did not file a federal or state income tax return for the years 1983, 1984, 1985 and 1986.
His work record and income during this period was fleshed out during cross-examination. After the dissolution, the first place he worked was in Minneapolis, at Dolbert Electronics, from December 1983 to the fall of 1984. He earned "4 something an hour" or "about $150.00 to $160.00 per week." However, he said he used most of this income to pay "his car debts", for "sleeping and eating", and "trying to get on his feet."
After fall, 1984, he left Minneapolis, came to the metropolitan St. Louis area and then went to Waynesville. In the spring of 1985, he worked as a bus driver in Waynesville for a "short period of time." At trial, he was not asked and, thus, did not say what his salary was for this job.[2]
Although it is not clear, he may have been employed as a telephone lineman for the City of St. Robert in June, 1985.[3] Apparently, he was injured on that job or another job in November, 1986, and he received $133.00 per week in worker's compensation from January, 1986 until April, 1986. He said he did not send any support money during this period of time because:
I used it mostly trying to make head way from one agency to another explaining to them why they shouldn't cut off my electricity because I didn't have enough money. Why I should this and do that and why I don't have a home, any money, why I don't have any furniture, why I don't have a car and why I'm having one heck of a good time sitting here talking to you.
He also said he worked for the United States Commissary at Fort Leonard Wood in the fall of 1987. However, he was unable to recall how much money he made during that time.
Simply stated, the father gave two explanations for his failure to pay support: he was unemployed for most of the time, and a back injury prevented him from working. These explanations, individually or collectively, are insufficient to shift the burden back to petitioners.
His claim that his unemployment precluded him paying child support carries no weight. He made no showing he was mentally incapable of working. Admittedly, he did say he admitted himself to a drug treatment program in Minneapolis, in 1976 and was an inpatient for 28 to 30 days. He also said he had been "drinking alcohol". Perhaps drugs and alcohol did fog his memory at trial. They did not show he was incapable of finding work and working, as his subsequent work record showed.
Moreover, he was not injured until November 1986, and this injury did not preclude him from working at the United States Commissary in the fall of 1987. In addition, his work record does show he did have the skills to make him employable, and he made no showing he made any reasonable efforts to obtain employment while he was unemployed.
More important, perhaps, his salary from December 1983 to the fall of 1984 was "about $150.00 to $160.00 per week" and he received worker's compensation of $133.00 per week from January 1986, until April 1986. We must presume the dissolution court considered his income and ability *903 to pay child support when it ordered him to pay $30.00 per week as support. Thus, his ability to pay $30.00 per week over and above his bare necessities had been factored into the support order. Under the guidelines used by our Courts, his salary and his worker's compensation enabled him to pay child support during those times, and it certainly enabled him to make some payment toward that support. 1 Mo.Family Law, § 14.16 (MoBar 4th ed. 1988); see also present Rule 88.01, Form No. 14.
He did say his impression in January 1986 was that "[the petitioners] weren't going to let me see [the child] no matter what happened." And, he also said that, in the fall of 1984, he did not know where petitioners resided and, he "still don't know where [the child] lives". However, he said there were people he knew who could have told him where the petitioners resided during these periods. Moreover, his obligation to support his child is not interchangeable with his right to visit her, and it does not necessarily depend upon the natural mother's noninterference with his right of visitation. State ex rel. Williams v. Williams, 647 S.W.2d 590, 593 (Mo.App.1983). Furthermore, his testimony the natural mother told him, some three and one-half years before trial, that the petitioners had already adopted the child carries no weight, because he also said he did not believe the natural mother's statement.
In short, according to his testimony: he suffered no physical or mental impairment showing him to be unemployable; he possessed the skills to make him employable; he made no effort to pay child support when he was employed or receiving income; and he made no reasonable effort to obtain employment when he was unemployed. He simply chose a lifestyle inconsistent with his parental support obligation and did not meet that obligation for over four and onehalf years. For these reasons, the trial court's finding the natural father did not willfully neglect the child is against the weight of the evidence, and we have the firm belief that finding is wrong.
In their second point, petitioners allege that the trial court erred in finding the adoption would not be in the best interests of the child. We agree.[4]
The primary and paramount consideration in an adoption proceeding is the welfare of the child. In re Drew, 637 S.W.2d 772, 778 (Mo.App.1982). A finding concerning the best interests of a child, perhaps, should be accorded greater deference than other findings. Matter of Williams, 672 S.W.2d 394, 395 (Mo.App. 1984). However, the trial court's decision is still subject to appellate review. Id. at 396. Where a decision of a trial court is unsupported by the record, we can and will reverse the judgment. Id.
There is no question that petitioners provide a suitable home for the child. However, a finding that petitioners would provide a good home for the child does not end the matter. Williams, supra, at 395-96. Other factors a court must consider are the present and future effects of adoption, including the detrimental effects of termination of parental rights, and the child's emotional ties to and interaction with the parties. Filial ties with the noncustodial parent have been considered an important element in this consideration and can defeat a petition for adoption. Matter of Adoption of R.M.B., 645 S.W.2d 29, 30 (Mo.App.1982).
In the present case, there is almost a total absence of any filial ties with the natural father. At best, the evidence *904 shows just three contacts between him and the child in the fall of 1983, over three years prior to the filing of the adoption petition. The only evidence showing what the natural father did for the child is his testimony that he prays for her, tries to be the best person he can be, and leaves her where she is. Granting the adoption will not interfere with any of these benefits the child gets from the natural father.
We find no need to remand this cause to amplify the record on the best interests of the child. To us, the natural father failed to make any showing his failure to pay support was for just cause or excuse, and nothing in the record shows any emotional filial ties which would be harmed by granting the adoption. Therefore, we reverse the judgment of the trial court, remand this cause to it and order the petition for adoption be granted.
SMITH and GRIMM, JJ., concur.
NOTES
[1] § 453.040(5) provides that the consent to adoption is not required from:

(5) A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection.
[2] In an answer to an interrogatory, he said he was paid "minimum wages" for this job. His answer, however, was not read into evidence.
[3] In an answer to an interrogatory, he said he worked for:

City of Waynesville, Missouri. X-XX-X-XX. Telephone Linesman. Gross pay was about $900 per month. Left job because of job related injury. Worker's Comp. claim pending.
At trial, on direct examination, he, at first, indicated "Waynesville" should have been "St. Robert". Then, he expressly denied he had worked as a lineman between June, 1985 through January, 1986 and he also denied that he left that job "because of a job related injury."
At trial, he did admit he received worker's compensation. The salary stated in the interrogatory answer, however, was not read into evidence.
[4] Whether the trial court did make this "finding", as a matter of law, is questionable. Having found the petitioners failed to prove the natural father either willfully neglected or willfully abandoned the child, the Court stated in its order:

Furthermore, in view of the foregoing, the court does not reach the issue as to whether the adoption is in the best interests of the child. Nevertheless, the court does find that the Petitioners have not sustained their burden of proof to the effect that the adoption is in the best interests of the child.