**In re the Matter of A.L.H., a minor.**

**No. 66713.**

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 15, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 25, 1995.

Lynn M. Travis, Alton, IL, for appellant.

Elizabeth W. Swann, Seann & Hendrix, O'Fallon, William J. Alward, Guardian Ad Litem, Clayton, for respondent.

REINHARD, Presiding Judge.

Natural father (father) appeals from a decree of adoption in favor of natural mother and her current husband, which had the effect of terminating father's parental rights in his daughter. We affirm.

A.L.H. (daughter), the only child of mother and father's marriage, was born on September 29, 1984. The marriage was dissolved on October 2, 1987 in St. Louis County. Pursuant to a separation agreement incorporated into the decree of dissolution, custody of daughter was awarded to mother, and father agreed to pay $60.00 a week in child support. The parties waived maintenance. The visitation schedule stated that father had the right to temporary custody on every other weekend and for two weeks in the summer "as long as [father was] on vacation from his job."

On May 9, 1992, mother re-married. Daughter has lived continuously with mother and new husband since the marriage. On March 3, 1993, mother and new husband filed a petition for adoption of daughter. They alleged that father had willfully abandoned and neglected daughter for a period of "at least six (6) months immediately prior to the filing of this Petition." *See* § 453.040(5), RSMo 1994.

Father did not consent to the adoption and filed an answer denying the allegations of abandonment and neglect. A hearing on the petition was held on July 11, 1994. An investigation as to the suitability of the adoptive home was waived. *See* § 453.070.3, RSMo 1994. The court found father had willfully abandoned and neglected daughter for a period of at least six months immediately prior to the filing of the petition for adoption and found that it was in the best interests of daughter that the adoption be approved. On appeal, father asserts that the court's finding that he willfully abandoned and neglected daughter was not supported by substantial evidence and was against the weight of the evidence.

 Adoption statutes are strictly construed in favor of natural parents. *H.W.S. v. C.T.,* 827 S.W.2d 237, 239 (Mo.App.1992). Each adoption must be judged on its own

unique set of facts. *Id.* The prerequisite to any adoption is the consent of the natural parents or involuntary termination of their parental rights. *Matter of J.F.K.,* 853 S.W.2d 932, 934 (Mo. banc 1993).

In *G.S.M. v. T.H.B.,* 786 S.W.2d 898 (Mo. App.1990), we summarized the requisites for step-parent adoptions:

In a stepparent adoption, either willful abandonment or willful neglect of the child by the non-petitioning natural parent obviates the need for that parent's consent to the adoption. § 453.040(5) RSMo 1986; *e.g., In re Adoption of H,* 712 S.W.2d 726, 727 (Mo.App.1986). *The critical period is the six month period immediately prior to the date the petition for adoption is filed.* § 453.040(5) RSMo 1986.

Abandonment and neglect are different, but not mutually exclusive, concepts. *See, In re Adoption of Baby Boy W,* 701 S.W.2d 534, 543 (Mo.App.1985). Abandonment has been defined as the "voluntary and intentional relinquishment of custody of the child with the intent to never again claim the rights and duties of a parent," *Id.* at 543, or, as the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse. *In re E.C.N.,* 517 S.W.2d 709, 715 (Mo.App.1974); *In re Watson's Adoption,* 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946).

Neglect, on the other hand, normally focuses on physical deprivation or harm. It is primarily a failure to perform the duty imposed upon the parent by law and by conscience. *Adoption of Mike and Russ,* 553 S.W.2d 706, 708 (Mo.App.1977). In stepparent adoptions, it quite often is shown by a failure to provide support, without just cause or excuse, *whether ordered by judicial decree or not. See, e.g. Baby Boy W,* 701 S.W.2d at 544, and cases cited therein.

The issue of abandonment or neglect turns on intent, which, more often than not, is an inferred fact, determined by conduct within the statutory period, *Matter of T.C.M.,* 651 S.W.2d 525, 529 (Mo. App.1983), along with relevant conduct both before and after this period. *Adop-*

*tion of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 358 (Mo. banc 1978). The proof of this intent must be shown by clear, cogent and convincing evidence. *T.C.M.,* 651 S.W.2d at 530–31. *Id.* at 900 (footnote omitted) (emphasis added).

■ Section 453.040(5) uses the terms neglect and abandonment in the disjunctive and thus, either ground, if supported by sufficient evidence, would support the adoption. *Matter of Adoption of Pearson,* 612 S.W.2d 30, 35 (Mo.App.1981). Clear, convincing and cogent evidence is that which instantly tilts the scales in the affirmative when weighed against opposing evidence. *H.W.S.,* 827 S.W.2d at 240. Our review of this case is provided by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *S.C.H. v. C.W.H.,* 587 S.W.2d 945, 947 (Mo.App.1979). We must sustain the court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32. We review the facts and the reasonable inferences therefrom in the light most favorable to the trial court's order. *H.W.S.,* 827 S.W.2d at 240. We accept as true the evidence and permissible inferences favorable to the judgment and disregard all contrary evidence and inferences. *Id. While reference to other abandonment and neglect cases may provide some helpful guidance in reaching a decision, the very nature of these proceedings is such that each case must turn on its own unique set of facts. S.C.H.,* 587 S.W.2d at 947.

■ In this case, the trial court "specifically reject[ed] the evidence presented by [father]" contrary to the finding of abandonment and neglect "as not being credible". We defer to the trial court's determination of credibility and its resolution of conflicts in the evidence. *H.W.S.,* 827 S.W.2d at 240.

■ Though, as noted, adoption statutes are strictly construed in favor of the natural parent, the "paramount concern" remains the best interest of the child. *Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 357 (Mo. banc 1978). However, questions regarding the child's best interest are not reached if willful abandonment or neglect within the minimum statutory period are not proved. *Id.* The statutory period has been lessened twice, from two years to one year in 1947, *see Laws of Missouri* 1947, S.B. 335, p. 213, and from one year to six months in 1982. *See Laws of Missouri* 1982, H.B. Nos. 1171, 1173, 1306 & 1643, p. 433. We believe these reductions evidence a legislative intent to place a greater emphasis on the enhancement of opportunities for the establishment of permanent parental relationships for the child and a lesser emphasis on the parental interests.

■ The petition for adoption was filed on March 3, 1993. Thus, the relevant minimum period provided by § 453.040(5) was from September 3, 1992 to March 3, 1993. Though, as noted, conduct relevant to intent may occur before, after, or during the statutory period, the greatest weight must be given to conduct in the statutory period (the "critical period", *G.S.M., supra* ), and logically, the least to conduct occurring after the petition was filed.

In *S.C.H.,* 587 S.W.2d at 948, we held that a non-custodial parent's:

> ... failure to contribute to the financial support of his children coupled with the other evidence as to lack of contact with them was sufficient to sustain the trial court in its findings of willful neglect in failing to provide proper care and maintenance.

The trial court's judgment here focused on father's lack of support and contact. We examine both in turn.

■ Father made only one payment of child support within the statutory period; $25.00 in September 1992 which father dropped off at mother's grandparents. This was the first payment made by father after June of 1991. The September 1992 payment was accompanied by a letter in which father stated that he had paid a lawyer "to get visitation to see [daughter] and that he was going to start sending twenty-five dollars a week...." However, father next made a child-support payment in October 1993 (approximately eight months after the petition for adoption was filed).

Father was, by his own admission, never current in his child support payments. Mother testified that from the dissolution, "[u]p until April of '90, it was like the visits, very spora[d]ic, usually cash and just, you know, a few dollars here, a few dollars there. Sometimes it would be forty or fifty dollars. I can't really ever remember a time that I got the full amount, but I'm sure there probably was a couple...." Mother characterized father's responses to her requests for child-support in the above period: "Normally, he just wouldn't call me back or anything. If he didn't have the money, he wouldn't call, and I think even if he did have the money, he didn't call." A short period (about a year) of "somewhat regular" payments occurred after April 1990.

In *G.S.M., supra*, we reversed the trial court's denial of a step-parent adoption where the evidence revealed that the father had never made a child-support payment. Judge Satz, speaking for the court, stated:

In a stepparent adoption, like the present one, the petitioners have the burden of proving the existence *vel non* of a condition obviating parental consent by clear, cogent and convincing evidence. *Tomlinson v. O'Briant*, 634 S.W.2d 546, 551 (Mo. App.1982). However, no Missouri case we have found discusses what the petitioners must do to meet their burden. A sensible allocation, we believe, permits the petitioners to establish a prima facie case of willful neglect by showing, with clear and convincing evidence, that the natural father had a duty to pay child support and failed to do so. Once a prima facie case is made, the burden of going forward with the evidence shifts to the natural father who must show why his failure to pay support was not willful. If he does so, the petitioners must still prove by clear and convincing evidence that the natural father's explanatory evidence was pretextual or not reasonable and, thus, his failure to pay support was willful.

*Id.* at 901. Here, father failed in his support obligation within the statutory period, and it

became his burden to produce evidence that failure was not willful. That burden "focuses on several factors which include both his ability and willingness to earn an income, his willingness to support his child, and his use of his funds to provide himself only with the bare necessities of life prior to providing support for his child." *Id.*

In *G.S.M.*, we found the reasons proffered by the father for his lack of support to be insufficient to satisfy his burden of production: "Without reference to any specific period of time, he explained this failure by saying he had been unemployed for 'most of the time', he was 'on public assistance from time to time', and he had suffered a back injury on one job which made it virtually impossible for him to earn a living." *Id.* We stated these explanations: "individually or collectively, are insufficient to shift the burden back to petitioners.... [H]e made no showing he made any reasonable efforts to obtain employment while he was unemployed." *Id.* at 902.

Here, father testified he had over 100 hours of college credit. He offered two reasons for his general failure to pay support throughout the post-dissolution period: (1) because his work history was "spotty" and he rarely earned more money than it took him to survive, and (2) after December 1991, he refused to pay support because his visitation was refused. Father's testimony regarding his recent employment situation was very general. He stated that the period between spring 1990 until summer 1991 was the only one in which he was collecting a weekly paycheck. Other than that, he stated, his job situation was "[n]ot stable. I've had a lot of odd jobs...." He stated he had a lawn maintenance company where he worked in the summers of 1991, 1992 and 1993. During the winter months of those years, apparently, he sometimes had jobs with employers like restaurants and convenience stores. He introduced copies of his income tax returns from 1991, 1992 and 1993 which showed his adjusted gross income for those years to be $1,638.00,[1] $6,255.00, and $5,233.00 respec-

---

1. In his testimony, father stated his gross income for 1991 was $5,550.00. Father may have confused his gross income with the total of his standard deduction and personal exemption (Line 4 on Internal Revenue Service Form 1040EZ (1991)), which was $5,550.00.

tively. However, father stated that there was additional income from odd-jobs and the lawn maintenance business which he apparently did not always declare for tax purposes. He also occasionally paid no rent in return for services to his landlord.

The most important elements missing from father's work history are the total lack of specific evidence as to his work activity within the statutory period, *i.e.,* whether he was employed, seeking work or unable to work.[2] In sum, father presented the sort of non-specific testimony we found insufficient to satisfy the father's burden of production in *G.S.M.* As to father's visitation rationale, we note that his child support obligation "is not interchangeable with his right to visit her, and it does not necessarily depend upon the natural mother's noninterference with his right of visitation." *G.S.M.,* 786 S.W.2d at 903.

Notwithstanding the principle that interference with visitation does not necessarily excuse non-support, the court apparently did not believe father requested visitation in the period between January 1991 and March 3, 1992.[3] We now examine the evidence concerning visitation.

The evidence revealed that father did not see daughter in the period between July 1991 and the petition's filing in March 1993 (approximately 20 months).[4] Mother changed her residence in July 1991.[5] The parties' testimony agreed that, after that move, father did not know mother's home address and phone number. Mother stated she was also frequently unaware of father's whereabouts. The parties disagreed on whether mother had refused to reveal her home address and phone number to father (mother stated father had never asked). Mother also denied she had instructed her grandparents to refuse father her address (as father contended).

Father could contact mother at work, however, using a toll-free number. In August 1991, mother testified that father called her there and asked if she had moved. Mother told him she had, but was busy and asked him to call back. Father did not do so. He next called in December 1991; at that time he requested visitation. Mother said no, citing an incident which had occurred during a June 1991 visitation (which she had only learned about in late August). Father testified mother told him that "she felt ... it was unsafe for [daughter] to spend time with me or see me."[6]

2. The trial court found that father had, at the minimum, the financial ability to pay *at least* the twenty-five dollars a week that he pledged to make in September 1992. It stated:

 The Court finds that from January, 1992 to March 3, 1993, the [father] delivered a birthday gift for the minor child together with a twenty-five dollar ($25.00) money order in September, 1992 and a Christmas gift. The twenty-five dollars ($25.00) was paid on the advice of an attorney that [father] pay twenty-five dollars ($25.00) per week and [father] still did not pay the twenty-five dollars a week as directed. Further, [father] knew the conduits for payment of child support and continued to neglect such obligation.

 The court also apparently disregarded the birthday present and Christmas gift. Slight acknowledgments of child does not prevent neglect from occurring. Such token efforts do not atone for the lack of support or visitation during the relevant period. *In re Adoption of H,* 712 S.W.2d 726, 728 (Mo.App.1986).

3. The court stated: "Although [father] indicated he was not aware of the whereabouts of the minor child, [father] made no efforts to locate the child during the period of January, 1992 to March 3, 1993."

4. The evidence revealed father did not frequently exercise his visitation rights in the years immediately after dissolution. Mother characterized his 1987 visitation as occurring "very infrequently". She said he saw daughter "sporadically" in 1988 and "real infrequently" in 1989. The only period of "somewhat frequent[ ]" visitation occurred from April 1990 until the end of that year. The only period of custody by father to exceed one or two days was a seven day visit occurring around July 4, 1990. Mother testified that this visitation occurred at her request; she was having financial problems and asked father if he could help her by watching daughter for a time.

 Mother testified father's first request for visitation after the petition was filed occurred in October 1993.

5. From July 1991 through April 1992, mother lived at Grandview Apartments in Florissant. After her May 1992 marriage, she and daughter lived with new husband in another residence.

6. Father described the June 1991 incident thus:

 ... I was going out with this girl ... and we had been invited to a friend of mine's in East Alton ... for a barbecue. We went over to the

After Christmas 1991, some of mother's testimony would support a conclusion that she would not have been enthusiastic about allowing father visitation [7] and, father's testimony, if believed, would support a conclusion he requested visitation and those requests were denied. Mother stated, however, that father *made no contact* between January 1992 and March 3, 1993 (other than the September 1992 letter and gift and the 1992 Christmas gift). We are bound by the court's resolution in favor of mother on this factual matter.

In summation, we note that in some respects father's case here was stronger than the father's in *G.S.M.* However, the trial court here specifically found father's testimony to be non-credible. We conclude the court's judgment must be affirmed. Our finding on the neglect issue renders an examination of the willful abandonment finding unnecessary.

We affirm.

GARY M. GAERTNER, J., concurs.

CRAHAN, J., dissents in separate opinion.

CRAHAN, Judge, dissenting.

I respectfully dissent. After carefully examining the complete record, I agree with the guardian ad litem that Mother failed to adduce clear, cogent and convincing evidence that Father either willfully neglected or willfully abandoned the child so as to justify termination of his parental rights.

If this case involved a dispute over custody of the child, I would have no problem affirming the trial court's conclusion that it is in the child's best interest to reside with Mother and Stepfather. But custody of the child is not in issue. Father agrees that Mother and Stepfather should continue to have primary custody. The issue is whether Father's parental rights to the child should be terminated and, in essence, transferred to Stepfather, thereby severing all links between Father and his child.

Both by law and by nature, parents have the primary right against the world to their children; a right which has been properly characterized by this court as an "inherent natural right." *S.K.L. v. Smith,* 480 S.W.2d 119, 123 (Mo.App.1972). The power of the court to extinguish this right exists solely by statute. *In re Taylor,* 419 S.W.2d 473, 475 (Mo.App.1967). The relationship of parent and child is not to be lightly cast aside for any paternalistic sociological theory. *State v. Taylor,* 323 S.W.2d 534, 537 (Mo.App.1959). Rather, absent consent, such rights may be terminated only upon "clear, cogent and convincing" evidence of one of the grave reasons specified by law. *See S.K.L. v. Smith,* 480 S.W.2d at 123 (discussing Chapter 211 RSMo.) Evidence is "clear, cogent and convincing" when it "instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true." *In Interest of T.M.E.,* 874 S.W.2d 552, 559 (Mo.App.1994). Termination of parental rights is an awesome power conferred upon the courts and before it is exercised there must be strict and literal compliance with the statutory scheme. *In re C.,* 468 S.W.2d 689, 691 (Mo.App.1971).

*Willful Neglect*

Willful neglect has been defined by this court as the failure to perform the duty with which the parent is charged by law according

---

barbecue and [daughter] was with us ... and my friends and [girlfriend] were drinking. It's a barbecue, you know, but they started drinking too much, and I wasn't drinking at all, and there were some behavior being displayed by my ex-girlfriend that I didn't appreciate, ... so I told her that we were going to leave.... We were going to go home, but my friend didn't want to take us home.... I called a cab, and we went home. And then the incident in the residence is when my girlfriend at the time returned to my home and started being physical in the house.... She broke out windows in our house, and she was just totally

radical, and [daughter], unfortunately, was there to see all of this.... I called the police, and the police came and arrested [girlfriend] for drunk and disorderly.

During the incident, "[Daughter] ... got scared and ran outside and was in between mine and my neighbor's trailer."

7. In step-parent adoption cases, acts of the custodian to hinder communication or visitation must be taken into account. *See In re Adoption of S.E.F.,* 634 S.W.2d 265, 267 (Mo.App.1982).

to acceptable community standards. *S.K.L. v. Smith*, 480 S.W.2d at 124. In order to be willful, the neglect must be intentional, deliberate and without just cause or excuse, thus excluding acts which occur because of events which are beyond the control of the parent and which are not his fault. *Id.*

Father acknowledged that he was never current in his child support payments. The majority relies on *G.S.M. v. T.H.B.*, 786 S.W.2d 898, 901 (Mo.App.1990), for the proposition that such evidence alone is sufficient to shift the burden to Father to show why his failure to pay support was not willful. Although *G.S.M.* is distinguishable for the reasons discussed below, it is at least questionable whether such a shift of the burden of proof can be reconciled with the clear, cogent and convincing standard of review. Surely a bare showing of delinquency in child support payments, without more, cannot be said to "instantly tilt the scales" to the conclusion that the failure to satisfy the support obligation was willful. To engage in such a presumption without at least some minimal evidence of qualifications for and availability of work and the level of expenses required to provide the parent with the bare necessities of life seems contrary to the solemn presumptions in favor of the natural parent discussed above.

In any event, *G.S.M.* should not be deemed controlling in this case because a number of key factors cited by the *G.S.M.* court in support of its analysis are not present. Specifically, in *G.S.M.* the court expressly relied on the trial court's determination in the original decree that the natural parent had the ability to make the support payments ordered in the decree as a key factual predicate for shifting the burden of proof. In contrast, Mother's counsel conceded in this case that the $60.00 per week in ordered child support was high in relation to applicable guidelines. Mother testified that Father was often unemployed during the marriage although he advertised for odd jobs and attempted to start his own business. Father's income tax records for the years 1991, 1992 and 1993 reflect income of only $1,638.00, $6,255.00 (including $940.00 in unemployment compensation), and $5,233.00 (including $3,486.00 in unemployment compensation) respectively.[1] Even giving Mother the benefit of the most generous assumptions about unreported income from odd jobs, this level of income would not support an award of $60.00 per week in child support under the guidelines applicable either at the time of dissolution or at the time of trial. In fact, the amount of support was set by agreement and was based solely on Mother's child care expenses at the time of the decree and not on Father's ability to pay. Nor, unlike *G.S.M.*, does it appear that the decree court ever made any assessment of Father's ability to pay. The decree itself was entered by default and the provisions for child support were incorporated based on a finding that they were "not unconscionable."

In *G.S.M.*, the evidence also established that the natural parent never made *any* support payments despite several periods of employment which paid substantial wages. In this case, however, Mother conceded that Father made regular payments when he was able to find regular work and discontinued regular payments only after he was refused further visitation and had undertaken to procure legal assistance to restore his visitation rights.[2] Although Mother's denial of visitation does not justify discontinuance of support, there is no evidence that Father had the means to satisfy his support obligation or even to make more modest payments while attempting to come up with the legal retainer required to enforce his visitation rights. Nor was there any evidence that Father's attempt to restore his visitation rights through the legal system resulted in any deprivation to the child. In sum, there was no clear, cogent and convincing evidence of willful neglect.

### Willful Abandonment

This ground is even easier to dispose of than willful neglect because it is undisputed

---

1. In contrast, Mother's income consistently exceeded $20,000.00.

2. During this period, Father continued his attempts to forward gifts through his former mother-in-law on the child's birthday and at Christmas. Father later learned that these gifts were donated to others.

that Mother moved the child to a location she did not reveal to Father until after filing the petition and advised Father that further visitation would not be permitted. Indeed, if anything in this record can be said to be supported by clear, cogent and convincing evidence, it is that since the time Mother and Stepfather became engaged in late spring or early summer of 1991, Mother engaged in a persistent pattern of conduct designed to remove Father from the child's life and to substitute Stepfather as "dad" in the child's eyes. By her own testimony, Mother: (1) moved the child to a new address with an unlisted phone number, neither of which were disclosed to Father; (2) told Father he could not see the child because of the altercation between Father and his girlfriend in the child's presence in July 1991;[3] (3) did not discourage the child from calling Stepfather "dad"; and (4) after the remarriage, allowed the child to begin using Stepfather's surname.

"Abandonment is a 'willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of custody of the child to another with the intent to never again claim the rights or duties of a parent.'" *Deardorff v. Bohannon,* 761 S.W.2d 651, 654 (Mo.App. 1988) (citing *In re Adoption of Baby Boy W,* 701 S.W.2d 534, 543 (Mo.App.1985)). "It may also occur when a parent withholds the care, protection, love and presence of a parent without just cause or excuse." *Id.* Under these established definitions, abandonment was not shown by clear, cogent and convincing evidence in this case.

Neither Mother's brief nor the trial court's findings suggest just how Father was supposed to have maintained visitation with the child after Mother moved and failed to provide any forwarding address or telephone number. At best, the implication is that Father should have tried harder to learn the child's whereabouts or to maintain communications through Mother's relatives. It is un-

disputed that Father had a toll-free work telephone number for Mother, although the evidence indicates that this line was not to be used for personal calls. There was no evidence that Father knew Mother's work address. Even if he had, the suggestion that Father should have tailed or stalked Mother to her new address strikes me as irresponsible. Father should not be faulted for attempting to enforce his visitation rights through established legal channels. Although he apparently had trouble coming up with the funds required for a retainer and ultimately had to change counsel, Father's actions in pursuing his visitation through proper legal channels cannot properly be characterized as willful abandonment.

Likewise, there was no evidence that Mother's relatives were a reliable source of contact with the child. Father testified without contradiction that his former mother-in-law would not disclose Mother's or the child's whereabouts, nor was there any assurance that Father's attempts to communicate with the child by gifts or notes delivered to the former mother-in-law would actually reach the child.[4]

This record simply does not support the conclusion that Father voluntarily relinquished his parental rights. Mother's own evidence establishes that the lack of contact between Father and the child during the relevant statutory period was due solely and exclusively to her actions in refusing him further visitation and removing the child to an undisclosed location. Such actions have been held to preclude a finding of abandonment. *Deardorff,* 761 S.W.2d at 654–55.

For the foregoing reasons, I would reverse the judgment of the trial court.

---

**3.** Neither the trial court, the parties nor the majority suggest that this incident in any way could support a finding of willful neglect or that it warranted Mother's unilateral termination of Father's visitation rights.

**4.** Father's testimony indicates that these attempts at communication were refused by the child.