937 S.W.2d 734 (1996)
L., C.B. and J.L., Petitioners/Respondents,
v.
L., K.E., Respondent/Appellant.
No. 69659.
Missouri Court of Appeals, Eastern District, Division Two.
December 3, 1996.
Motion for Rehearing and/or Transfer Denied January 30, 1997.
Application to Transfer Denied February 19, 1997.
*735 J.D. Fisk, St. Louis, for Respondent/Appellant.
Peter J. Maniscalco, Clayton, Guardian-Ad Litem.
C.B.L., St. Charles, pro se.
Bruce F. Hilton, Webster Groves, for J.L.L.
Motion for Rehearing and/or Transfer to Supreme Court Denied January 30, 1997.
GERALD M. SMITH, Judge.
Natural mother, Kim, appeals from a judgment terminating her parental rights to D.L., her son, and decreeing that D.L. is adopted by Chris, his natural father, and Judy, his stepmother. We reverse.
D.L. was born in 1988. In 1991 the marriage of Kim and Chris was dissolved. The dissolution was by default as Kim did not answer or appear. The decree provided that Chris would have custody of D.L. and that Kim pay $200 per month in child support. The parties all agree that Kim made no payments of child support. Chris testified *736 that he never discussed the matter of support with Kim and never asked her to make support payments. At one time when he was out of work he sought assistance payments from the state and he believed the state contacted Kim to obtain payments from her. Kim testified that she was not aware of the court order requiring support payments until January 1993 when she received notification that she owed back child support. She testified that she did not have the money to pay the support provided in the decree. Chris testified that the reason he never brought up the issue of child support with Kim was "For the most part, I was making enough money to support the family. And although the $200 would have helped out a lot, it wouldn't have made that big of an impact on the lifestyle that we led as a family."
The parties agreed that Kim visited with the child an average of once a month since the dissolution with the exception of a one year period when Chris moved his family to Kentucky for other employment. During that year Kim saw the child four to six times when the family visited in the St. Louis area. Kim did not travel to Kentucky to visit her son. Other than the period of the Kentucky residency the longest time lapse between visits between Kim and her son was six weeks. She also talked to him by telephone at least as frequently as she saw him, usually when she was making arrangements for visitation. Kim had a few overnight visits with her son between 1991 and 1993, but none after that. She testified that she was living with two other people in a two bedroom trailer where she slept on the couch in the living room, for which she paid fifty dollars a week rent. She did not consider either the living conditions or the people living in the trailer to be sufficiently acceptable to bring her son to her residence. She referred to her trailer mates as "slobs" who used excessive profanity.
Visits were arranged at the convenience of all parties, and Kim testified that the intervals between visits were a result of both her work schedule and problems coordinating with Chris and Judy's schedules. The testimony of Chris and Judy was basically consistent with that testimony.
There was testimony from Chris, Judy and Kim that Kim often brought gifts for her son during her visits and that she would sometimes ask Chris or Judy what the child needed in order to buy an appropriate gift. There was testimony that Kim provided an allowance to her son on the occasions of her visits, which he frequently spent during the visits. When advised on one occasion that D.L. was having behavior problems at school, Kim conditioned continuation of allowance on improvement of his behavior. Kim attended at least one recital of D.L. and two of his soccer games. Kim testified that during her visits with D.L. they read, went to the zoo, played in the park, played putt-putt golf, went to a sports shop, played soccer, baseball, football, squirt guns, played with his toys, went to the mall, saw movies, went to dinner, went to Toys-R-Us, and went to the science center. Chris testified that D.L. thinks of Kim as "Santa Mom" because "she shows up every now and again and takes him presents and takes him to fun places and then brings him home and he has a good day."
Chris and Judy both testified that they filed the petition for adoption because they were concerned about the custody situation if something were to happen to Chris. D.L. refers to Judy as "mom" and to Kim as his "other mom". Judy has a very close relationship with D.L. which Kim acknowledged in her testimony. Chris and Judy each expressed their desire to keep Kim in D.L.'s life if the adoption petition was granted. Chris testified that the adoption would not adversely affect D.L. because Kim will "still be allowed to visit [D.L.] whenever she wants and [D.L.] won't have any knowledge that there is any significant difference in his life." He further testified that it was in D.L.'s best interest to continue visiting with Kim because "I just feel like everyone should know who their biological parents are. And [D.L.] does and it's not fair to take that away from him." Judy testified to similar beliefs.
Kim acknowledged that Chris and Judy are providing a good home for D.L. and she does not want custody, and for the foreseeable future does not believe that she is in a position to provide him with an adequate *737 home and care. She wanted to keep her parental rights so she could continue to visit D.L.. She felt he benefits from their relationship.
The court found that Kim had for the statutory period:
"willfully, substantially and continuously neglected to provide the minor person with necessary care and protection. The credible evidence reflects that the mother has failed to provide any support for the minor person since the date of the dissolution of her marriage with the father although she had the financial means to do so. The court rejects as incredible the mother's testimony to the contrary. Her nominal gifts to the child were token efforts on her part."
The court then stated in its decree: "Accordingly, it is the opinion of the Court that it is fit and proper that the adoption be approved since the welfare of said minor person so demands."
Consent of the natural parents or involuntary termination of their parental rights is a prerequisite to any adoption. In the Matter of J.F.K., 853 S.W.2d 932 (Mo.banc 1993)[1]. Consent is not required from:
A parent who has for a period of at least six months, for a child one year of age or older, ... willfully abandoned the child, or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection. § 453.040(5) RSMo 1994.
The terms "abandoned" and "neglected" are used disjunctively and either ground, if supported by substantial evidence, will support termination of parental rights. G.S.M. & L.M.M. v. T.H.B., 786 S.W.2d 898 (Mo.App.1990)[1]. Abandonment and neglect are different, but are not mutually exclusive concepts. Id. at [2]. Abandonment is defined as the voluntary and intentional relinquishment of custody of the child with the intent to never again claim the rights or duties of a parent, or, the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse. Id.
Neglect normally focuses on physical deprivation or harm. It is primarily a failure to perform the duty imposed upon the parent by law and by conscience. In stepparent adoptions it quite often is shown by a failure to provide support, without just cause or excuse, whether ordered by judicial decree or not. Id. at [3]. In both neglect and abandonment the issue turns on intent, which generally is an inferred fact, determined by conduct within the statutory period, combined with relevant conduct both before and after this period. Proof of intent must be shown by clear, cogent and convincing evidence. Id. at [4,5]. Clear, cogent and convincing evidence is that which instantly tilts the scales in the affirmative when weighed against opposing evidence. In re the Matter of A.L.H., 906 S.W.2d 373 (Mo.App. 1995)[3,4].
Adoption statutes are strictly construed in favor of natural parents. Id. at [1,2]; H.W.S. v. C.T., 827 S.W.2d 237 (Mo. App.1992)[1-3]. Each adoption must be judged on its own unique set of facts. Matter of A.L.H., supra. The termination of parental rights is one of the most serious acts that a court can undertake. In re C., 468 S.W.2d 689 (Mo.App.1971)[1,2]. Once accomplished and an adoption is granted "all legal relationships and all rights and duties between such child and his natural parents... shall cease and determine." § 453.090.1 RSMo 1994. We believe, therefore, that with the extreme penalty which is imposed upon the natural parent, the level of parental indifference necessary to warrant termination should be comparable under either an abandonment or neglect proceeding. In In the Matter of S.C.H. v. C.W.H., 587 S.W.2d 945 (Mo.App.1979)[2], we defined willful neglect as required by the statute as neglect that is "intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego ... parental duties over the period of time which the statute prescribes." (Emphasis supplied) That definition tracks and is comparable to the definition of abandonment which has been judicially recognized.
In G.S.M., supra we addressed the allocation of the evidentiary burdens of the *738 parties in establishing neglect. It is quite possible to read that opinion as establishing that failure to meet judicially imposed support obligations is, in and of itself, sufficient to support a finding of neglect in the absence of evidence of justification. Such a reading goes beyond the facts before us in G.S.M.[1] In that case we noted the absence of any filial ties between the child and the natural father. That a parent intentionally does not provide support does not alone establish an intent to relinquish the status of parent. A parent's failure to contribute to the financial support of his children "coupled with the other evidence as to lack of contact with them was sufficient to sustain the trial court on its findings of willful neglect in failing to provide proper care and maintenance." (Emphasis supplied) In the Matter of S.C.H. v. C.W.H., supra at [4]; A.S.A., Sr. v. K.L.W., 931 S.W.2d 218 (S.D. Mo.App.1996). We have found no case where failure to provide support alone has been held to warrant termination of parental rights.
In this case Kim has continued contact with her son since his birth. Father has never requested support from her and has never discussed with her her failure to provide support. The evidence does not establish that Kim chose a life-style inconsistent with her support obligation. The record demonstrates she was employed at a series of low-paying jobs which possibly could have allowed payment of some child support at some sacrifice. However, the child has been fully cared for and has not wanted for necessities. Chris did not consider support from Kim important to the family standard of living. On one occasion when Chris was briefly out of work Kim offered him $50 which she characterized as a gift and which he characterized as a loan. He declined the offer. The trial court characterized Kim's gifts to her son as "tokens" but it is clear that she continuously provided clothing, toys, and allowances to him. While her involvement in his activities was limited, it did exist. The record does not support a finding that Kim neglected her son as the courts have defined that term for purposes of termination of parental rights.
Further, the court's finding that adoption was in the child's best interest was premised on the failure of Kim to pay child support. Failure to pay child support does not per se determine the best interest of the child. All involved parties want to maintain the mother-son relationship and visitation as it has existed in the past. All agree that it is in the best interest of D.L. that he maintain the relationship with his mother. However, once the adoption becomes final that relationship can continue to exist only upon the option of the adoptive parents. They may terminate the relationship and visitation at any time for any reason or for no reason.
Chris and Judy have provided a suitable home for the child. But that is only one factor in assessing the best interests of the child. Also to be considered are the present and future effects of adoption, including the detrimental effects of termination of parental rights, and the child's emotional ties to and interaction with the parties. Filial ties with the non-custodial parent have been considered an important element in this consideration and can defeat a petition for adoption. G.S.M., supra at [12]. The evidence from all parties established substantial filial ties between Kim and her son. All parties recognized severing those ties would have a detrimental effect on D.L. The only reason expressed for desiring the adoption was the possibility that in the future something could happen to Chris, leaving the child's status with Judy in limbo. That is a valid consideration in a stepparent adoption but we do not find it outweighs the benefits to the child arising from his relationship with his natural mother.
Much evidence was adduced concerning the respective home environments of Kim vis a vis Chris and Judy. Kim makes no request for the custody of her son and freely acknowledged that she is not presently nor in the foreseeable future capable of providing a home for him. The evidence concerning Kim's home environment, while relevant in a *739 custody dispute, is largely irrelevant here and does not impact on the issues involved.
Judgment ordering termination of mother's parental rights and granting adoption to petitioners is reversed.
CRANE, P.J., and PUDLOWSKI, J., concur.
NOTES
[1] The shifting of the burden of proof approach set forth in G.S.M. has been questioned as being in conflict with the clear, cogent and convincing requirement to establish neglect. In the Matter of A.L.H., supra (Crahan, J., dissenting).